# Nos. 15-56880, 16-55089, 16-55626

IN THE
# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

**PHARRELL WILLIAMS, an individual; et al.,**
*Plaintiffs/Counter-Defendants/Appellants/Cross-Appellees*,

and

**MORE WATER FROM NAZARETH PUBLISHING, INC.; et al.,**
*Counter-Defendants/Appellants/Cross-Appellees*,

*v.*

**FRANKIE CHRISTIAN GAYE, an individual; et al.,**
*Defendants/Counter-Claimants/Appellees/Cross-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HON. JOHN A . KRONSTADT, DISTRICT JUDGE ● CASE NO. 13-cv-06004 JAK (AGRx)

---

# OPENING BRIEF OF COUNTER-DEFENDANTS/APPELLANTS INTERSCOPE RECORDS, UMG RECORDINGS, INC., UNIVERSAL MUSIC DISTRIBUTION, AND STAR TRAK ENTERTAINMENT

---

**SIDLEY AUSTIN LLP**
PETER I. OSTROFF, postroff@sidley.com
MARK E. HADDAD, mhaddad@sidley.com
ROLLIN A. RANSOM, rransom@sidley.com
MICHELLE B. GOODMAN, mgoodman@sidley.com
AMANDA R. FARFEL, afarfel@sidley.com
555 West Fifth Street, 40th Floor ● Los Angeles, California 90013 ● (213) 896-6000

*Attorneys for Counter-Defendants/Appellants*
INTERSCOPE RECORDS, UMG RECORDINGS, INC., UNIVERSAL MUSIC
DISTRIBUTION, AND STAR TRAK, LLC

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Counter-Defendants/Appellants Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC (erroneously sued as Star Trak Entertainment) state as follows:

Interscope Records is a division of UMG Recordings, Inc. The following entities have a direct or indirect ownership interest in UMG Recordings, Inc.: Universal Music Group Holdings, Inc., Universal Music Group, Inc., and Vivendi S.A. No other publicly held corporation owns 10% or more of the stock of UMG Recordings, Inc.

Universal Music Distribution is a division of UMG Commercial Services, Inc. The following entities have a direct or indirect ownership interest in UMG Commercial Services, Inc.: Universal Music Group Holdings, Inc., Universal Music Group, Inc., and Vivendi S.A. No other publicly held corporation owns 10% or more of the stock of UMG Commercial Services, Inc.

The following entities have a direct or indirect ownership interest in Star Trak, LLC: Star Trak Entertainment, LLC, Interscope Records, UMG Recordings, Inc, Universal Music Group Holdings, Inc., Universal Music Group, Inc., and Vivendi S.A. No other publicly held corporation owns 10% or more of the stock of Star Trak, LLC.

Dated: August 23, 2016 /s/ *Mark E. Haddad*
Mark E. Haddad
SIDLEY AUSTIN LLP

*Attorneys for Interscope Records,*
*UMG Recordings, Inc., Universal*
*Music Distribution, and Star Trak,*
*LLC*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........2

STATEMENT OF THE CASE...............................................................3

      A.    The Parties ..............................................................................3

      B.    The Gaye Parties' Claim For Copyright Infringement ..........4

      C.    Summary Judgment................................................................4

      D.    Trial .......................................................................................5

              1.    Jury Instructions.........................................................8

              2.    Verdict Form...............................................................10

              3.    The Verdict ................................................................12

      E.    The Gaye Parties' Post-Trial Motion For Declaratory Relief............12

SUMMARY OF ARGUMENT ..............................................................16

STANDARD OF REVIEW ...................................................................19

ARGUMENT .........................................................................................19

I.    THE DISTRICT COURT'S DECISION TO RECONCILE SUPPOSED INCONSISTENCY IN THE JURY'S GENERAL VERDICTS BY ENTERING JUDGMENT AGAINST THE INTERSCOPE PARTIES VIOLATES THE SEVENTH AMENDMENT AND RULE 50. .................19

      A.    The Seventh Amendment And Federal Rule Of Civil Procedure 50 Prohibit Courts From Substituting Their Judgment For The Jury's Findings Of Fact. .......................................................19

      B.    The District Court Erred In Entering Judgment Against The Interscope Parties Under Rule 50(b)...................................22

iv

C.    A Court May Not Grant Judgment As A Matter Of Law To Resolve Inconsistency Among General Verdicts.................................25

    1.    The Court May Not Choose Between Inconsistent General Verdicts To Resolve An Inconsistency.............25

    2.    The Gaye Parties Waived Any Objection Based On Inconsistent General Verdicts...................................34

II.    THE COURT SHOULD REVERSE THE JUDGMENTS OF INFRINGEMENT FOR THE REASONS STATED IN THE ARTISTS' BRIEF ...............................................................................36

CONCLUSION ....................................................................................36

REQUEST FOR ORAL ARGUMENT ................................................38

CERTIFICATE OF COMPLIANCE...................................................39

STATEMENT OF RELATED CASES .................................................40

CERTIFICATE OF SERVICE .............................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Central Vermont Ry., Inc.*,
  319 U.S. 350 (1943)......................................................................24

*Baltimore & Carolina Line, Inc. v. Redman*,
  295 U.S. 654 (1935)...............................................................19, 20

*Berry v. United States*,
  312 U.S. 450 (1941).....................................................................20

*Dimick v. Schiedt*,
  293 U.S. 474 (1935)................................................................20, 29

*Duk v. MGM Grand Hotel, Inc.*,
  320 F.3d 1052 (9th Cir. 2003) ....................................................35

*El-Hakem v. BJY Inc.*,
  415 F.3d 1068 (9th Cir. 2005) ...............................................26, 27

*Fidelity & Deposit Co. v. United States*,
  187 U.S. 315 (1902).....................................................................20

*Floyd v. Laws*,
  929 F.2d 1390 (9th Cir. 1990) ....................................................34

*Freund v. Nycomed Amersham*,
  347 F.3d 752 (9th Cir. 2003) ......................................................21

*Galloway v. United States*,
  319 U.S. 372 (1943).....................................................................20

*In re Circuit Breaker Litig.*,
  852 F. Supp. 883 (C.D. Cal. 1994) ............................................28

*Int'l Longshoremen's Union v. Hawaiian Pineapple Co.*,
  226 F.2d 875 (9th Cir. 1955) ................................................17, 27

*Jarvis v. Ford Motor Co.*,
  283 F.3d 33 (2d Cir. 2002) .........................................................25

vi

*Johnson v. New York N.H. & H.R. Co.*,
    344 U.S. 48 (1952).............................................................23

*Kode v. Carlson*,
    596 F.3d 608 (9th Cir. 2010) .........................................19, 34, 35, 36

*Lifshitz v. Walter Drake & Sons, Inc.*,
    806 F.2d 1426 (9th Cir. 1986) ...........................................21

*Neely v. Martin K. Eby Const. Co.*,
    386 U.S. 317 (1967).........................................................21

*Nitco Holding Corp. v. Boujikian*,
    491 F.3d 1086 (9th Cir. 2007) .......................................17, 22

*Philippine Nat'l Oil Co. v. Garrett Corp.*,
    724 F.2d 803 (9th Cir. 1984) ......................................19, 35, 36

*Tennant v. Peoria & P. U. Ry. Co.*,
    321 U.S. 29 (1944)......................................................17, 24

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*,
    546 U.S. 394 (2006)...............................................17, 21, 22, 23

*Walker v. N.M. & S. Pac. R.R. Co.*,
    165 U.S. 593 (1897)..........................................................20

*Wallace v. City of San Diego*,
    479 F.3d 616 (9th Cir. 2007) .............................................24

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*,
    106 F.3d 894 (9th Cir. 1997) .....................................*passim*

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...........................................23

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ......................................17, 25, 26

## Statutes

17 U.S.C. §§ 101 *et. seq.*...............................................................2

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 ...................................................................................2

**Other Authorities**

Fed. R. App. P. 4(a)(1) .........................................................................2

Fed. R. Civ. P. 49 ..........................................................................17, 26

Fed. R. Civ. P. 50 .......................................................................*passim*

U.S. CONST. amend. VII................................................................*passim*

**INTRODUCTION**

After a seven-day trial, a jury found that musical artists Robin Thicke and Pharrell Williams infringed Marvin Gaye's song *Got To Give It Up* with their own hit, *Blurred Lines*. In a separate brief, Thicke and Williams, together with co-writer and musical artist Clifford Harris (collectively, "the Artists"), explain why the jury's verdict of infringement cannot stand given the lack of evidence of infringement and fundamental errors in critical jury instructions. These arguments apply equally to the four counter-defendants/appellants who submit this brief, and are adopted but not repeated here.

This brief addresses the district court's extraordinary decision to overturn the jury's general verdicts in favor of Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC (erroneously sued as Star Trak Entertainment) (the "Interscope Parties"), entities that co-own the sound recording of, and/or distribute, *Blurred Lines*. This Court has long recognized that courts must allow a jury's inconsistent general verdicts to stand unless there is a valid basis, procedurally and substantively, to overturn them as a matter of law under Rule 50. Where, as here, no such basis exists, a court may address a perceived inconsistency among general verdicts only by resubmitting the case to the jury, with supplemental instructions if appropriate, to allow the *jury* to resolve the inconsistency. A court that later overturns a general verdict in order to "reconcile" it with another general verdict violates a litigant's Seventh Amendment right to trial by jury.

1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 17 U.S.C. §§ 101 *et. seq.* This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

The district court entered judgment on December 2, 2015. ER 1-3.[1] On December 7, 2015, the Interscope Parties filed a timely Notice of Appeal under Fed. R. App. P. 4(a)(1). ER 154-55.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Does the district court's decision to set aside the jury's verdict that the Interscope Parties did not infringe the Gaye Parties' copyright in *Got To Give It Up* and impose judgment notwithstanding the verdict violate the Interscope Parties' Seventh Amendment right to trial by jury and exceed the court's authority under Rule 50 of the Federal Rules of Civil Procedure, particularly where:

(a) the Gaye Parties failed to satisfy the procedural and substantive requirements of Rule 50;

(b) the verdict form did not expressly ask the jury to find that *Blurred Lines* was substantially similar to the protected elements of *Got To Give It Up*, and the court lacked a basis to infer that the jury necessarily made that factual finding;

(c) the judgment imposes joint and several liability on the Interscope Parties for actual damages in excess of three million dollars; and

---

[1] The Interscope Parties cite to the Excerpts of Record ("ER") submitted jointly by the Interscope Parties and the Artists.

(d)    the Gaye Parties waived their objection to inconsistency in the jury's general verdicts by failing to raise that objection prior to the jury's discharge?

## STATEMENT OF THE CASE

### A.    The Parties

When singer-songwriter Marvin Gaye died in 1984, his children Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III (the "Gaye Parties") inherited the copyrights in his musical compositions, including *Got To Give It Up*. ER 2308-2409.  Marvin Gaye recorded *Got To Give It Up* in his studio in 1976. ER 111.  In early 1977, a music publisher registered *Got To Give It Up* and deposited sheet music with the United States Copyright Office (the "Deposit Copy"). ER 118-19.  Marvin Gaye's sound recording of *Got To Give It Up*, which included musical elements not contained in the Deposit Copy, reached number one on the Billboard Hot 100 in 1977.  ER 2449.

Pharrell Williams, Robin Thicke, and Clifford Harris Jr. are musical artists who co-own the musical composition copyright in the song *Blurred Lines*.  In June 2012, Williams and Thicke wrote and recorded most of *Blurred Lines*.  ER 2460-63.  Several months later, they gave the recorded tracks to Harris, who wrote and recorded a rap verse for the song. ER 438-39.  *Blurred Lines* was released in 2013 and became the year's best-selling single globally, with 12 weeks as the number one song on Billboard's Hot 100.  ER 2449.

Star Trak, LLC, a venture formed by Interscope Records (a division of UMG Recordings, Inc.) and Star Trak Entertainment, LLC, owns the sound recording of

*Blurred Lines.*  ER 2462.  Universal Music Distribution manufactured and distrib-
uted *Blurred Lines.  Id.*

### B.    The Gaye Parties' Claim For Copyright Infringement

The Gaye Parties made an infringement demand to Williams and Thicke in
2013.  ER 2291.  When negotiations for an amicable resolution were unsuccessful,
the Artists filed suit for a declaratory judgment of non-infringement.  ER 2288-93.
The Gaye Parties filed counterclaims against the Artists, asserting that *Blurred
Lines* infringes the copyright in *Got To Give It Up*, and added the Interscope Par-
ties (collectively, with the Artists, the "Thicke Parties") as defendants on those
claims.  ER 2206-87.[2]

### C.    Summary Judgment

In July 2014, the Thicke Parties moved for summary judgment.  The Thicke
Parties argued that, as a matter of law, *Blurred Lines* is not substantially similar to
the protected elements in the Deposit Copy of *Got To Give It Up.*[3]  Dkt. 89; *see* ER
2118-59.  The district court agreed that, to define the scope of the Gaye Parties'
copyright in *Got To Give It Up*, the court must look not to the sound recording but
to the Deposit Copy.  The court began its analysis by filtering out, as irrelevant to

---

[2] The Gaye Parties also counterclaimed against EMI April, Inc., Jobete Music Co.,
Inc., and Sony/ATV Music Publishing Acquisitions, Inc., but voluntarily dismissed
these counter-defendants on January 15, 2014.  *See* ER 2489.

[3] The Gaye Parties opposed the motion, arguing, among other things, that evidence
of direct copying—public statements made by Thicke and Williams concerning the
influence of Marvin Gaye and *Got To Give It Up* on *Blurred Lines*—constituted an
independent and sufficient ground for denying summary judgment.  The district
court held that this evidence was irrelevant to anything other than an assessment of
whether any copying was willful.  *See* ER 122-37.

4

the question of substantial similarity, all musical elements of the sound recording of *Got To Give It Up* that do not appear in the Deposit Copy. ER 120-21, 126-27, 129-30, 132-33. After applying this filter, however, the district court failed to address whether *Blurred Lines* is extrinsically similar to the protected elements in the Deposit Copy of *Got To Give It Up*. The court instead summarily concluded that "disputes, supported by competing expert analyses," precluded summary judgment. ER 133.

### D. Trial

At trial, the Gaye Parties relied upon public statements made by Thicke and Williams that they were inspired by Marvin Gaye and aimed to capture the "groove" and "feel" of the sound recording of *Got To Give It Up*.[4] During opening statements, the Gaye Parties presented audiovisual clips and transcripts of these statements. *E.g.*, ER 233 (Williams "said he went into the studio and he tried to take the feeling that *Got To Give It Up* gave him when creating *Blurred Lines*"), 234 ("in this interview, Mr. Williams says I was – when creating *Blurred Lines*, quote, I was trying to pretend that I was Marvin Gaye"); 236 ("No less than eight times, Mr. Thicke said in interviews promoting *Blurred Lines* that *Got To Give It Up* was one of his favorite songs of all time and that he, Mr. Thicke, told Mr. Williams he wanted to create something just like *Got To Give It Up*."), 236 (Thicke statement that "I was like, damn, we should make something like that, something

---

[4] The Thicke Parties moved to exclude this evidence as prejudicial, irrelevant to access and substantial similarity, and insufficient to prove copying. Dkt. 172. The court denied the motion. ER 107.

5

with that groove."); *see also* ER 1560-61 (Thicke "told Pharrell Williams that *Got to Give it Up* was one of his favorite songs of all time and that he wanted to create a song like *Got to Give it Up*, so Mr. Williams started with percussion and tried to get the *Got to Give it Up* rhythm, and the song was created in about an hour. He gave no less than eight interviews saying essentially the same thing. He was all over the media saying it."). The Gaye Parties presented no such testimony as to Harris, the third composer and co-owner of the musical composition copyright in *Blurred Lines*, who did not testify.

On substantial similarity, the court allowed the Gaye Parties' experts to compare *Blurred Lines* to elements found only in the sound recording, and not the Deposit Copy, of *Got To Give It Up*.[5] *See* Artists' Opening Br., 48-53; Dkt. 393. The court also permitted lay witnesses, including Janis Gaye and UMG executive Harry Weinger,[6] to testify that they believed *Blurred Lines* was similar to the sound recording of *Got To Give It Up*; neither had compared *Blurred Lines* to the Deposit Copy. ER 299-310 (Gaye testimony); ER 517-31 (Weinger testimony).

In closing arguments, counsel for the Gaye Parties again chose to emphasize their contentions that Thicke and Williams intended to create a song similar to *Got*

---

[5] A pretrial ruling established that the Gaye Parties could only introduce sound recordings edited to "contain[] what is reflected on the deposit copy." ER 100-05. The court purported to apply this standard to the expert testimony on these grounds. *See* ER 546-557.

[6] The district court denied the Thicke Parties' pretrial motion to exclude evidence that Weinger, a UMG executive who had no role in exploiting *Blurred Lines* and who had never seen the Deposit Copy, told a marketing executive at UMG that he thought *Blurred Lines* was "utterly based on" the *Got To Give It Up* sound recording. ER 93, 520.

*To Give It Up*. ER 1572-73. Counsel also explained to the jury how to find Harris and the Interscope Parties liable given the absence of evidence of any intent by them to create a song with the groove of *Got To Give It Up*. Referring the jury to question two of the verdict form, which asked whether the jury finds "that the Thicke Parties infringed the Gaye Parties' copyright," counsel told the jury that their answer should be "yes" as to Williams and Thicke. ER 1572. As to Harris, he said the answer "is a little bit more complicated," but he explained that "Harris has ownership in *Blurred Lines*" and that they should answer "yes for him because he is liable as a co-owner in *Blurred Lines*." *Id.* As to the question regarding infringement by the Interscope Parties, counsel for the Gaye Parties told the jury that "Star Trak Entertainment is partly owned by Pharrell Williams and partly owned by Universal and they released the album, they sold it, they manufactured it, and all of that makes them responsible, as you will see in the jury instructions, for copyright infringement." ER 1572-73.

The court also read several stipulations to the jury. ER 1523-29. The stipulations provided facts regarding the popularity of *Blurred Lines* and *Got To Give It Up*, ER 2448-59, the role of each party with respect to the ownership of copyrights in and distribution of *Blurred Lines*, ER 2460-63, and the financial profits generated by *Blurred Lines*, ER 2464-69.

### 1. Jury Instructions

The court submitted 44 final instructions to the jury. ER 1530-51 (read into the record); ER 1662-1708 (final instructions). Several key instructions were presented over the parties' objections.[7] Two sets of instructions are relevant here.

<u>Liability for Copying:</u> Instructions 28 and 35 described how the Gaye Parties "may show" copyright infringement. After cross-referencing the statement in Instruction No. 27 "that the Gaye Parties have the burden of proving that the Thicke Parties copied original elements from the Gaye Parties copyright work," Instruction 28 stated:

> The Gaye Parties *may show* the Thicke Parties copied from the work by showing by a preponderance of the evidence that the Thicke Parties had access to the Gaye Parties' copyrighted work and that there are substantial similarities between the Thicke Parties' work and original elements of the Gaye Parties' work.

ER 1690 (emphasis added). Instruction 35 similarly stated (in pertinent part):

> *To prove* that the Thicke Parties copied the Gaye Parties' works, the Gaye Parties *may show* that the Thicke Parties had access to the Gaye Parties' copyrighted works and that there are substantial similarities between the Thicke Parties' works and the Gaye Parties' copyrighted works.

ER 1698-99 (emphasis added).

Even though Thicke and Williams conceded that they had access to *Got To Give It Up* and identified it as a source of inspiration, the court instructed the jury on subconscious copying. In particular, Instruction 42 told the jury that to find that

---

[7] On February 3 and 17, 2015, the parties submitted proposed jury instructions and their respective positions on disputed instructions. ER 1843-55; ER 1874-1927.

the Thicke Parties copied *Got To Give It Up*, it would be "sufficient" to find that

they "subconsciously copied" the song. Instruction 42 stated:

> *In order to find that the Thicke Parties copied* [*Got To Give It Up*], it is not necessary that you find that the Thicke Parties consciously or deliberately copied [the song]. *It is sufficient if you find that the Thicke Parties subconsciously copied . . . the Gaye Parties' song*[].

ER 1706 (emphasis added). Nothing in Instruction 42 referred to any need for the

Gaye Parties to prove substantial similarity to protected elements of the Gaye Par-

ties' work. The district court adopted the Gaye Parties' proposed instruction on

subconscious copying in part, ER 1737-38, over the Thicke Parties' objection that

subconscious copying was irrelevant and was likely to confuse and mislead the ju-

ry, ER 1884-85.

      <u>Liability for Distributing an Infringing Work:</u> Instruction 24, an agreed-

upon Ninth Circuit Model Jury Instruction, stated that "copyright law protects

against production, distribution, and performance of substantially similar copies of

the owner's copyrighted work without the owner's permission." ER 1686; *see*

Ninth Circuit Manual of Model Civil Jury Instructions § 17.1. Instruction 35, in

language drawn from a Ninth Circuit Model Jury Instruction (modified in ways not

relevant here), further explained the conduct giving rise to distributor liability:

> One who reproduces, prepares derivative works from, distributes, or performs a copyrighted work without au-thority from the copyright owner during the term of the copyright, infringes the copyright.

ER 1699; *see* Ninth Circuit Manual of Model Civil Jury Instructions § 17.0.

The Gaye Parties' proposed yet another instruction on joint and several lia-
bility, but the court refused to give it, noting that it was "redundant with respect to
other instructions." ER 1738. The Gaye Parties' proposed instruction read:

> A distributor who distributes an infringing work is liable
> for copyright infringement. Any member of the distribu-
> tion chain is joint and severally liable for the copyright
> infringement. Members of the distribution chain include
> any persons or entities engaged in the sale, distribution,
> and/or publication of the infringing work. Joint and sev-
> eral liability means that infringing party is individually
> responsible for the entire damage obligation.

ER 1936.1. The Thicke Parties objected to this instruction because it was incorrect
as a matter of law. *See* ER 1893. At the close of evidence, the Gaye Parties re-
newed their request that the court give their proposed Instruction 39, which the
court again denied. ER 1489-92.

### 2. Verdict Form

The parties submitted competing proposed verdict forms. The Thicke Par-
ties' proposal would have required the jury to make several separate and express
factual findings, including whether protectable elements of *Got To Give It Up* were
extrinsically and intrinsically similar to *Blurred Lines*, before asking whether each
set of Thicke Parties infringed the copyright in *Got To Give It Up*. ER 1937-51,
1957-60. The Gaye Parties' proposal would have asked the jury only to answer,
separately for each set of Thicke Parties, whether that set of defendants infringed
the copyright in *Got To Give It Up*. ER 1952-56.

The Gaye Parties objected to the Thicke Parties' proposed form, arguing that
the Thicke Parties' inquiries into the separate elements of infringement misstated

10

the law and could lead to confusion and an inconsistent verdict. ER 1869-73. The Thicke Parties objected to the Gaye Parties' proposed form because it did not distinguish between each counterclaim defendant for purposes of liability, willfulness, and profits, and because it conflated the separate remedies of profits and actual damages. *See* ER 1712. After meeting and conferring, the parties again filed competing proposed forms. To address the court's stated preference for a "simpler" and "more straightforward" verdict form ER 1813, the Thicke Parties removed their proposed interrogatories on the separate factual elements of infringement. ER 1711-22. The Gaye Parties' proposal separated the remedies of profits and actual damages, but did not distinguish between each counterclaim defendant for purposes of liability or willfulness. ER 1723-30.

The court adopted a form that required separate findings of liability and willfulness as to each set of Thicke Parties. ER 60-67. At a conference with the parties at the close of all evidence, ER 1510, the court explained that the verdict form would require "a separate determination because there are separate counterclaim defendants [and] . . . if this liability is found and if damages are awarded, we'll then be able to see how that -- how that occurred." ER 1515-17. Addressing the Gaye Parties' assertion that the counterclaim defendants "are all liable if one of them is liable," ER 1515, the court stated that if "there is a finding of no liability as to a particular counterclaim defendant whom you contend has to be liable as a matter of law in light of the finding, other findings, you can make that motion to correct the verdict." ER 1517.

### 3. The Verdict

The jury returned a verdict finding that the Interscope Parties and Harris did not infringe the Gaye Parties' copyright in *Got To Give It Up*. ER 61. The jury found that Williams and Thicke had infringed the *Got To Give It Up* copyright, but did not willfully infringe. ER 61, 63. The jury awarded the Gaye Parties $4,000,000 in actual damages, $1,610,455.31 in profits separately against Williams, $1,768,191.88 in profits separately against Thicke, and $0 in profits against Harris and the Interscope Parties. ER 62.

After the clerk read the verdict, the court asked counsel whether they would like the court to poll the jury; counsel for the Interscope Parties responded affirmatively, while counsel for the Gaye Parties remained silent. ER 1656. Having polled the jury, the court thanked the jurors for their service and dismissed them. ER 1657. Counsel for the Gaye Parties then immediately asked the court to enter a permanent injunction restricting the further distribution of *Blurred Lines*. ER 1657-58. The court also asked the Thicke Parties for their position on their claim for declaratory relief, allowing the Thicke Parties to brief that issue and the Gaye Parties to file a response. ER 1658-60. At no point did the Gaye Parties object to the verdict or ask that it be resubmitted to the jury. ER 1656-60.

### E. The Gaye Parties' Post-Trial Motion For Declaratory Relief

On May 1, 2015, the Gaye Parties filed a "Post-Trial Motion for Declaratory Relief" asking the district court to enter an order declaring that all of the Thicke Parties "are directly liable to the Gaye family for copyright infringement." Dkt. 376 at 5. Although the jury found Harris and the Interscope Parties not liable for

infringement, the Gaye Parties argued that the court should "declare" the opposite because the court had previously "stated during trial that the Interscope Parties, and by implication, Harris, would be liable for copyright infringement if Thicke and the Williams Parties were found liable." Dkt. 376 at 9.

The Interscope Parties opposed the motion. Dkt. 393. They explained that, although the court told the Gaye Parties they could file a post-trial motion to correct the verdict if they contended that a party was liable as a matter of law, the Gaye Parties did not move for judgment as a matter of law, and the Seventh Amendment prohibits the court from entering declaratory relief contrary to the jury's finding of no liability. The Interscope Parties argued that the court had no power to alter the jury's verdicts as to some parties even if they were legally inconsistent with the jury's verdicts as to others, and explained that neither the verdict form nor the jury instructions provided a basis for the court to infer that the jury had necessarily found that *Blurred Lines* was substantially similar to any protected elements of *Got To Give It Up*.[8]

On June 19, 2015, the district court asked the parties to file supplemental briefs addressing whether it could construe the Gaye Parties' "Post-Trial Motion for Declaratory Relief" as a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). ER 166. The Interscope Parties explained that the

---

[8] The Interscope Parties also argued that the Gaye Parties were not entitled to relief because they failed to introduce sufficient evidence of extrinsic similarity between *Blurred Lines* and the Deposit Copy of *Got To Give It Up*, and because the jury instructions, including Instructions 42 and 43, were erroneous and prejudicial. Dkt. 393 at 7-24.

court could not grant the Gaye Parties' motion under Rule 50(b) for four independent reasons: (1) the Gaye Parties waived relief under Rule 50(b) by failing to move before the verdict for judgment as a matter of law under Rule 50(a); (2) the Gaye Parties had not shown that the evidence submitted at trial was insufficient for a reasonable jury to return a verdict for the Interscope Parties; (3) the Gaye Parties had waived their objection to inconsistency by failing to ask the court to resubmit the verdicts to the jury; and (4) inconsistency among general verdicts does not permit the court to substitute its judgment for that of the jury. Dkt. 408.

The Gaye Parties argued that the court could grant relief not under Rule 50(b) but "pursuant to its duty to reconcile the verdict." Dkt. 407 at 6. They also argued that they did not waive Rule 50(b) relief because they argued in connection with the jury instructions that the Interscope Parties should be found liable for infringement if Thicke and Williams were found liable. Finally, they argued that the court should grant relief under Rule 50(b) because members of a distribution chain are liable for infringement as a matter of law.

The district court recognized that it had no power to grant the Gaye Parties "declaratory relief" that contradicted the jury's general verdict. ER 44. The court nonetheless decided to overturn the general verdicts for the Interscope Parties and Harris under Rule 50(b). The court also acknowledged that the Gaye Parties had not challenged the sufficiency of the evidence to support a verdict of no liability under either Rule 50(a) or Rule 50(b), and that their post-trial "claim is not that the evidence presented at trial could support only a finding that Harris and the Interscope Parties are liable for infringement." *Id*. Nonetheless, the court found

14

that "the Gaye Parties are entitled [under Rule 50(b)] to review of the verdict for plain error." ER 45.

The court further recognized that the jury's verdict was a general verdict, ER 47, and that the Seventh Amendment prohibits courts from disturbing a general verdict because it is inconsistent as between parties or claims. The court considered that principle limited, however, to cases where it is impossible to tell which verdict is the "correct" one. *Id*. In the district court's view, "there is no Seventh Amendment violation or interference with the fact-finding role of the jury" where its "factual conclusions may be determined from the general verdict, the inconsistency in the verdict may be traced to a missing or erroneous jury instruction, and the error may be remedied by applying the correct legal standard to the facts necessarily found by the jury." *Id*. According to the court, "[t]hese circumstances are present here." *Id*. The court acknowledged that "[t]he jury did not separately present any factual findings upon which [its] conclusions were based." ER 40. Yet the court asserted that the jury "must have determined that 'Blurred Lines' contained original, non-trivial elements that had been copied from 'Got to Give it Up' and was an infringing work." ER 36.

To explain the jury's contrary verdict in favor of Harris and the Interscope Parties, the court concluded that the jury must have misunderstood Instructions 24 and 35 on distributor liability. ER 47. Even though those instructions tracked the Ninth Circuit Model Jury Instructions, the court decided that "[n]either instruction adequately informed the jury that a person may be liable for distribution of an infringing work, as opposed to an unauthorized work of the author." *Id*. "[T]he

15

Gaye Parties' Instruction 39 was deficient because it stated that counterclaim-Defendants would be jointly and severally liable for all infringement." ER 47-48. The court nevertheless concluded that omitting "the Gaye Parties' proposed 'Instruction No. 39' or some variation of it" was "plainly erroneous," and that such an instruction "would have inevitably resulted in consistent verdicts of liability." ER 48. The court also summarily concluded that Instructions 27, 28, 35, and 42 clearly informed the jury that it had to find that *Blurred Lines* was substantially similar to protected elements of the Gaye Parties' copyright before it could impose liability for copying on any party. ER 22.

On this basis, the court overturned the jury's verdict and imposed judgment as a matter of law against Harris and the Interscope Parties. The court also granted the Gaye Parties' request for a declaration that Harris and the Interscope Parties would be liable for prospective infringement of *Got To Give It Up* in *Blurred Lines*. ER 48. The court entered judgment against all of the Thicke Parties. ER 1-3.

## SUMMARY OF ARGUMENT

The district court violated the Interscope Parties' Seventh Amendment right to trial by jury when it overturned the jury's verdict and entered judgment against the Interscope Parties. The proper remedy for a party's concern about an inconsistent verdict is to resubmit the case to the jury, with supplemental instructions as appropriate; otherwise, the objection to inconsistency is waived. Absent resubmission to the jury, a court may enter judgment contrary to a jury's general verdict only if a party satisfies the procedural and substantive requirements of Rule 50(b). The Gaye Parties failed to satisfy any of Rule 50(b)'s requirements.

16

Procedurally, the Gaye Parties failed prior to the verdict to file a motion under Rule 50(a) for insufficiency of evidence, and never filed any post-verdict motion under Rule 50(b). These procedural defects alone foreclose the entry of judgment against the Interscope Parties under Rule 50. *See, e.g.*, *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 402 (2006); *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). Substantively, the Gaye Parties' post-trial motion failed to show that the evidence was insufficient as a matter of law to support the jury's verdict that the Interscope Parties did not infringe *Got To Give It Up*. Rule 50 thus provides no basis to overturn the jury's judgment. *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 32-36 (1944).

Other than Rule 50, no provision of the Federal Rules of Civil Procedure provides a procedural mechanism for overturning a jury's general verdict. Rule 49 addresses a court's authority to address inconsistencies between answers to a special verdict, or between answers to interrogatories and a general verdict. Fed. R. Civ. P. 49. Nothing in Rule 49, however, allows a court to reconcile inconsistent general verdicts, and this Court has long held that courts must allow inconsistent general verdicts to stand. *Zhang v. Am. Gem Seafoods*, *Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003); *Int'l Longshoremen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875, 881 (9th Cir. 1955).

The district court erroneously likened this case to the "rare situation" in *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 902 (9th Cir. 1997). In *Westinghouse*, this Court upheld the district court's decision to conform the jury's verdict on a fifth claim with the jury's verdicts on

17

the other four claims, finding that the four verdicts were unchallenged and the fifth was necessarily the result of an erroneous instruction uniquely applicable to it. Here, by contrast, the Interscope Parties do dispute the validity of the jury's finding of infringement, and there is no single instructional error that necessarily explains the alleged inconsistency in the verdicts. The district court's hypothesis that the jury may have overlooked two clear instructions on distributor liability does not explain why the jury failed to hold Harris, a co-creator of *Blurred Lines* and a co-owner of the musical composition copyright, liable for infringement. A more likely explanation for the verdicts is that the jury did not find substantial similarity but still imposed liability on Thicke and Williams based on their state of mind. This is consistent with the Gaye Parties' heavy emphasis on the alleged intent to copy *Got To Give It Up*, which the Gaye Parties argued only as to Thicke and Williams. It also comports with Instruction 42, which stated that a finding of "subconscious copying" was a "sufficient" basis to find copying, and with Instructions 28 and 35, which stated only that the Gaye parties "may" prove copying via substantial similarity, not that they must do so as an essential element of their claim against every counter-defendant.

The district court thus lacked any authority, whether inherent or under the Rules of Civil Procedure, to overturn the jury's general verdict in favor of the Interscope Parties as it improperly did. The district court, of course, was not altogether powerless to address the inconsistent verdicts at the appropriate time; it could have resubmitted the case to the jury, with supplemental instructions as appropriate, for further deliberations. But the Gaye Parties waived their right to such

relief by failing to ask for it at a time when the jury could have continued deliberating; they chose instead to seek an injunction to enforce the verdicts in their favor. Having made that choice, they waived their right to challenge the general verdicts in favor of the Interscope Parties on the grounds of inconsistency. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010); *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984).

## STANDARD OF REVIEW

"Whether it is permissible for a trial judge to disrupt the jury verdict . . . is a question of law, which we review de novo." *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997).

## ARGUMENT

**I.  THE DISTRICT COURT'S DECISION TO RECONCILE SUPPOSED INCONSISTENCY IN THE JURY'S GENERAL VERDICTS BY ENTERING JUDGMENT AGAINST THE INTERSCOPE PARTIES VIOLATES THE SEVENTH AMENDMENT AND RULE 50.**

**A.  The Seventh Amendment And Federal Rule Of Civil Procedure 50 Prohibit Courts From Substituting Their Judgment For The Jury's Findings Of Fact.**

The Seventh Amendment to the United States Constitution ensures that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. CONST. amend. VII.  The primary purpose of the Amendment is "to preserve the substance of . . . the common-law distinction between the province of the court and that of the jury, whereby . . . issues of law are to be resolved by the court and issues of fact are to be determined by the jury." *Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 656-57 (1935).

19

The Seventh Amendment does not prohibit judicial practices and procedures which merely "regulate[] the jury's role on questions of fact," *Galloway v. United States*, 319 U.S. 372, 390-91 (1943), such as those that allow the court to determine, as a matter of law, whether the court should ask a jury to decide a factual issue. *See, e.g.*, *Baltimore*, 295 U.S. at 659 (grant of judgment notwithstanding the verdict is constitutional because "[w]hether the evidence was sufficient or otherwise was a question of law to be resolved by the court"); *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 320 (1902) (finding summary judgment constitutional because it merely "prescribes the means of making an issue" and once "[t]he issue is made as prescribed, the right of trial by jury accrues"). But a court may not, "directly or indirectly, [] take from the jury or [give] to itself," the role of fact-finder. *Walker v. N.M. & S. Pac. R.R. Co.*, 165 U.S. 593, 596 (1897); *see, e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (holding that additur, in which a court imposes damages in excess of those awarded by the jury, violates the Seventh Amendment because it interferes with the jury's findings of fact).

Federal Rule of Civil Procedure 50 allows a court to overturn a jury's general verdict and order judgment as a matter of law, but only where strict procedural and substantive requirements are met. Rule 50 does not violate the Seventh Amendment because Rule 50's requirements ensures that a court will "not take[] away from juries and give[] to judges any part of the exclusive power of juries to weigh evidence and determine contested issues of fact—a jury being the constitutional tribunal provided for trying facts in courts of law." *Berry v. United States*,

312 U.S. 450, 452-53 (1941); *Neely v. Martin K. Eby Const. Co.*, 386 U.S. 317, 321 (1967).

Procedurally, Rule 50 respects the constraints of the Seventh Amendment by allowing a court to grant judgment as a matter of law before the case is submitted to the jury only after "a party has been fully heard on an issue during a jury trial," and only upon the grounds specified in the motion. Fed. R. Civ. P. 50(a). These requirements protect the opposing party's Seventh Amendment right to a jury determination by providing notice of any alleged deficiencies at a time when that party has an opportunity to correct them. *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1428-29 (9th Cir. 1986). If a court denies a Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion," and the party may "renew" the motion after the jury has returned a verdict. Fed. R. Civ. P. 50(b). Limiting motions under Rule 50(b) to those that renew a motion under Rule 50(a) ensures that the court is reviewing its own prior legal determination, and is not "engag[ing] in an impermissible reexamination of facts found by the jury." *Freund v. Nycomed Amersham*, 347 F.3d 752, 760-61 (9th Cir. 2003); *see* Fed. R. Civ. P. 50(b) advisory committee's note to 2006 amendment; *Unitherm*, 546 U.S. at 402 & n.4 (2006).

Substantively, Rule 50 permits a court to grant judgment as a matter of law only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). This standard "makes clear that action taken under the rule is a performance of the court's duty to assure enforcement of the controlling law and is not an intrusion on any responsibility for

21

factual determinations conferred on the jury by the Seventh Amendment or any other provision of federal law."  Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.

As shown below, while invoking Rule 50(b) to impose judgment as a matter of law against the Interscope Parties, the district court flouted Rule 50's procedural and substantive requirements.  As a result, the court usurped the jury's role as the finder of facts, in violation of both Rule 50 and the Seventh Amendment.

**B.    The District Court Erred In Entering Judgment Against The Interscope Parties Under Rule 50(b).**

Treating the Gaye Parties' post-trial motion for declaratory relief as a motion under Rule 50(b), and reviewing the verdict for "plain error," the district court overturned the jury's general verdict in favor of the Interscope Parties.  ER 44-45.  Rule 50 provides no basis for granting the Gaye Parties such relief.

First, the Gaye Parties waived their right to seek relief under Rule 50 by failing to move for relief on the issue of liability under Rule 50(a) or under Rule 50(b).  The failure to move for relief under Rule 50(a) alone waived the Gaye Parties' right to relief under Rule 50.  *Nitco*, 491 F.3d at 1089.

The district court acknowledged the Gaye Parties' failure to make a Rule 50(a) motion on the grounds asserted in their post-trial motion for declaratory relief, but found it unnecessary to decide the question of waiver because "the Gaye Parties are entitled to review of the verdict for plain error."  ER 44-45.  Review for plain error is not permitted, however, when a party also fails to file a Rule 50(b) motion.  *Unitherm*, 546 U.S. at 402; *Nitco*, 491 F.3d at 1089.

Here, the Gaye Parties filed only a Post-Trial Motion for Declaratory Relief that neither mentioned Rule 50(b) nor attempted to satisfy its substantive standards. Dkt. 376. The Supreme Court repeatedly has held that courts may not construe motions seeking other types of relief as motions for judgment as a matter of law under Rule 50(b). *Johnson v. New York N.H. & H.R. Co.*, 344 U.S. 48, 49, 51-53 (1952) (holding that a motion to set aside a verdict, which fails to ask for judgment notwithstanding the verdict, cannot be treated as a motion for judgment notwithstanding the verdict, even though the moving party, after the evidence was all in, moved for a directed verdict in its favor and the trial court reserved decision on that motion, and even though the trial court treated the motion as one for judgment under the rule); *Unitherm*, 546 U.S. at 401 ("the requirement of a timely application for judgment after verdict is not an idle motion because it is an essential part of the rule, firmly grounded in principles of fairness" (internal quotation marks omitted)). In the absence of a proper Rule 50(b) motion, the district court had no power under Rule 50 to overturn the jury's general verdicts for plain error.

Second, even if the Gaye Parties had preserved a right to review for "plain error" under Rule 50(b), a court may grant relief only where there is "plain error apparent on the face of the record that, if unnoticed, would result in a manifest miscarriage of justice." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) (internal quotation marks omitted). "This exception, however, permits only extraordinarily deferential review that is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency." *Id.* (internal quotation marks omitted). The Gaye Parties never argued, and

23

the district court admittedly did not hold, that the jury's verdict of non-infringement as to the Interscope Parties was unsupported by any evidence and that the evidence supported only a finding of infringement. ER 44 (acknowledging that the Gaye Parties' "claim is not that the evidence presented at trial could support only a finding that Harris and the Interscope Parties are liable for infringement"). In these circumstances, Rule 50 precludes the entry of a judgment of infringement as a matter of law.

Finally, the Gaye Parties did not try to satisfy, and could not have satisfied, Rule 50's standard for judgment as a matter of law, which a court may grant only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1), (b). Evidence that allows "fair minded" jurors to "reach different conclusions" forecloses entry of judgment not-withstanding the verdict. *Bailey v. Central Vermont Ry., Inc.*, 319 U.S. 350, 354 (1943); *see Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."); *Wallace v. City of San Diego*, 479 F.3d 616, 624, 629 (9th Cir. 2007) (reversing entry of judgment as a matter of law where sufficient evidence supported the verdict). The evidence that *Blurred Lines* is not substantially similar to the protectable elements of the Deposit Copy of *Got To Give It Up* was more than sufficient to support the jury's conclusion that the Interscope Parties did not infringe. *See* Artists' Opening Br., 31-41. For all of the-

24

se reasons, the district court erred in entering judgment as a matter of law under Rule 50 against the Interscope Parties.

### C. A Court May Not Grant Judgment As A Matter Of Law To Resolve Inconsistency Among General Verdicts.

The Gaye Parties sought to overturn the jury's general verdict in favor of the Interscope Parties only because it was inconsistent with a factual finding allegedly implicit in the general verdicts against Thicke and Williams. *See* ER 44 ("the evidence presented at trial, combined with the jury's implicit factual findings in the general verdict, could support no other conclusion.").[9] Nothing in the Federal Rules of Civil Procedure, however, gives courts authority to direct the entry of judgment to resolve inconsistencies among parties in general verdicts. To address inconsistent general verdicts, a district court should ask a jury to continue deliberations. By not asking the district court to instruct the jury to continue deliberations, the Gaye Parties waived their right to challenge inconsistency in the general verdicts.

#### 1. The Court May Not Choose Between Inconsistent General Verdicts To Resolve An Inconsistency.

The Seventh Amendment prohibits courts from altering a jury's general verdicts simply because they are legally inconsistent as between defendants. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003) (refusing to overturn jury verdicts due to alleged inconsistency, and stating that "legally

---

[9] The district court correctly held, and the Gaye Parties did not dispute, that "the verdict, although labeled a 'Special Verdict,' was a general verdict." ER 47; *see Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002).

inconsistent verdicts 'may nonetheless stand on appeal even though inconsistent'" and "this rule is historically sound and remains the majority rule") (quoting *Int'l Longshoremen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875, 881 (9th Cir. 1955)); *see id.* (refusing to overturn jury verdicts due to alleged inconsistency, and holding that return of general verdicts inconsistent as between defendants is "the jury's prerogative").

In this respect, general verdicts are unlike either special verdicts or general verdicts with written interrogatories. Rule 49 expressly addresses inconsistent special verdicts and general verdicts that are inconsistent with the jury's answers to written interrogatories. Courts may reconcile inconsistent special verdicts and may enter judgment consistent with an answer to an interrogatory that is consistent with the other answers but is inconsistent with the general verdict. Fed. R. Civ. P. 49(b)(3)(A). Where a jury's answers to interrogatories are inconsistent with each other and with the general verdict, "the court must direct the jury to further consider its answers and verdict, or must order a new trial." Fed. R. Civ. P. 49(b)(4). Rule 49 provides no authority, however, for reconciling inconsistent general verdicts, let alone for entry of judgment contrary to a general verdict and the requirements of Rule 50.

The district court cited *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005), and *Westinghouse Electric Corp. v. Gen. Circuit Breaker & Electric Supply, Inc.*, 106 F.3d 894 (9th Cir. 1997), as authority for reconciling inconsistent general verdicts. *El-Hakem*, however, concerned inconsistent "special verdict responses," and this Court held only that "[w]hen confronted by seemingly inconsistent

responses to special verdict interrogatories, a trial court has a duty to harmonize those responses whenever possible." *Id.* at 1074. When confronted with a situation similar to *El-Hakem* but involving inconsistent general verdicts, this Court let those general verdicts lie. *Int'l Longshoremen's Union*, 226 F.2d at 881 (refusing to overturn a general verdict against union even though jury returned general verdicts exonerating the individual defendants who had acted on behalf of the union).

*Westinghouse* also does not support the judgment. *Westinghouse* did approve entry of judgment contrary to a general verdict, but did not identify the source of the court's authority to do so. *Westinghouse* also makes clear that it approved such extraordinary relief only because the facts presented a "rare situation" that allowed the court "in these very limited circumstances" to "reconcile the verdicts without intruding upon the jury's fact-finding role." 106 F.3d at 902. The "rare situation" in *Westinghouse* did not recur here.

The defendant in *Westinghouse* asserted the same affirmative defense to each of five claims. After the jury returned a verdict accepting the defense as to four of the five claims, the district court concluded that the jury instructions misstated the elements necessary to prove that defense only as to the fifth claim. On appeal, this Court agreed that the instruction on the fifth claim was erroneous. Turning to the proper remedy for this error, the Court observed that "[o]rdinarily, when faced with an outcome-determinative error in instructing the jury, a trial judge should order a new trial." *Id.* at 903. However, analogizing to the court's ability to enter judgment as a matter of law based on issue preclusion, the Court

27

held that "justice has nothing to gain from a new trial" because the applicability of the affirmative defense was necessarily decided by the other four undisputed verdicts. *Id.* at 902. The validity of those four verdicts was unquestioned in *Westinghouse*, because the plaintiff did not appeal them, or challenge the instructions given on them, or argue that the jury could have reached its verdicts on those claims without necessarily deciding the validity of the affirmative defense.[10] For at least four independent reasons, *Westinghouse* does not support the judgment below.

First, unlike in *Westinghouse*, the verdicts against Thicke and Williams from which the court inferred the jury's factual findings are not "valid, and undisputed, jury verdicts." *Westinghouse*, 106 F.3d at 901-02 n.3. As explained more fully in the Artists' brief at pages 25-60, those verdicts are unsupported by substantial evidence, prejudiced by numerous erroneous evidentiary rulings, and tainted by incorrect instructions that, *inter alia*, allowed the jury to consider elements of *Got To Give It Up* not in the Deposit Copy. Both the Artists and the Interscope Parties have raised these challenges in the district court and on appeal.

Second, in *Westinghouse*, the court did not need to address the Seventh Amendment's prohibition against entering judgment that increases a jury's damages award, because the parties had agreed to try damages before the court. *In re*

---

[10] In *Westinghouse*, the ordinary remedy of "ordering a new trial would produce an anomalous result. If the district court had ordered a new trial only on the [challenged claim], the jury's earlier findings on the [other claims] would preclude Westinghouse from challenging the validity of the defendants' affirmative defenses. Thus, the results upon retrial would be identical to the status quo." 106 F.3d at 901 n.3.

*Circuit Breaker Litig.*, 852 F. Supp. 883, 887 (C.D. Cal. 1994) (district court opinion affirmed by this Court in *Westinghouse*). Here, by contrast, the jury specifically awarded $0 profits against the Interscope Parties, and found the Interscope Parties not liable for the infringement that the jury determined caused $4,000,000 in actual damages. ER 61-62 (Questions 3-4). As the district court recognized, "the correction of the verdict makes Harris and the Interscope Parties jointly and severally liable for the award of actual damages." ER 48. For a court to impose a damages obligation upon a party after the jury has decided not to require that party to pay damages alone violates the Seventh Amendment. *See Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (the court "by assessing an additional amount of damages, bring[s] the constitutional right of the plaintiff to a jury trial to an end in respect of a matter of fact which no jury has ever passed upon").

Third, the verdict form did not ask the jury to decide whether the *song*, *Blurred Lines*, infringed the protected elements of *Got To Give It Up*; it asked only in a single question whether each of the *counter-defendants* were liable for infringement. ER 61. There is thus no pattern of answers here comparable to the unique pattern in *Westinghouse* that ensures that a court can accurately deduce the jury's "factual findings . . . from the pattern of verdicts." *Westinghouse*, 106 F.3d at 902. Instead, from the wording of and answers to Question 2 (the general verdict on infringement), it is just as plausible to infer a factual finding of "no substantial similarity" from the verdicts as to Harris and the Interscope Parties as it is to infer the opposite factual finding from the verdicts as to the Williams Parties and Thicke:

<u>Question No. 2.:</u> **Do you find by a preponderance of the evidence that the Thicke Parties infringed the Gaye Parties' copyright in the musical composition "Got to Give It Up" in "Blurred Lines"?**

**Please answer "yes" or "no" for each of the following Thicke Parties:**

Pharrell Williams and More Water From Nazareth Publishing, Inc. (the "Williams Parties")

Answer:  Yes  ___X___

No  _____

Robin Thicke

Answer:  Yes  ___X___

No  _____

Clifford Harris, Jr.

Answer:  Yes  _____

No  ___X___

Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak Entertainment (the "Interscope Parties")

Answer:  Yes  _____

No  ___X___

ER 61.

Finally, and again unlike in *Westinghouse*, the district court's decision does not rest on a single instructional error that uniquely explains all of the alleged inconsistency. In *Westinghouse*, the court properly instructed the jury on the elements of defendants' affirmative defenses to four claims, but erroneously required defendants to prove an additional element to establish an affirmative defense to the fifth and final claim. 106 F.3d at 899-901. Where the jury found that defendants

30

had established affirmative defenses to all but the fifth claim, the court found the instructional error requiring this additional element dispositive. *Id.* at 901-02. Presuming that the jury followed the instructions as given, and based on the evidence presented, this instructional error misstating the law explained the inconsistency. *Id.* Here, by contrast, the jury received clear and legally proper instructions on distributor liability taken verbatim from the Ninth Circuit Model Jury Instructions,[11] and it was certainly not "plain error" for the court to refuse to give a third instruction on the same point.[12] It also was obvious to the jury that the Interscope Parties, as corporate entities, were in the case only because they distributed *Blurred Lines.*[13] Under *Westinghouse*, the district court should have concluded that the jury followed its non-erroneous instructions on distributor liability and therefore that that the jury decided that the Interscope Parties did not distribute a substantially similar work without the owner's permission.

---

[11] Instruction 24 stated that "copyright law protects against production, distribution, and performance of substantially similar copies of the owner's copyrighted work without the owner's permission." ER 1686. Instruction 35, entitled "Liability for Infringement" stated: "[o]ne who reproduces, prepares derivative works from, distributes, or performs a copyrighted work without authority from the copyright owner during the term of the copyright, infringes the copyright." ER 1689.

[12] As the court later recognized, the Gaye Parties' proposed instruction contained an incorrect statement of the law. ER 47 ("As proposed the Gaye Parties' Instruction 39 was deficient because it stated that Counterclaim-Defendants would be jointly and severally liable for all infringement. This was correct as to actual damages, but not as to profits, for which they would only be severally liable.").

[13] The jury was read a stipulation on the roles of the Interscope Parties during trial. ER 2460-63.

31

The alleged inadequacy of the instructions on distributor liability also does not explain the jury's verdict as to Harris. ER 47. The Gaye Parties' post-trial argument was that Harris could be considered a distributor because, as a co-owner of the musical composition copyright, he was responsible for authorizing distribution of *Blurred Lines*. ER 22. But the Gaye Parties did not argue this point to the jury, and even if they had, the argument still would not have provided the jurors a basis to treat Harris differently than Thicke and Williams, who also were co-owners and thus would have been just as responsible as Harris was for authorizing distribution. Unlike *Westinghouse*, in which the court found "an identifiable error that only could have affected one of the verdicts," 106 F.3d at 902, the instructions here on distributor liability are of little utility in explaining the inconsistent verdicts.

A more likely explanation of the jury's verdicts is that the jury followed other instructions to which the Thicke Parties objected, including Instruction 42, which allowed the jury to hold Thicke and Williams liable based on their state of mind. The court allowed the Gaye Parties to inundate the jury with testimony and argument about Thicke's and Williams' alleged subjective intent to copy, but the Gaye Parties had no comparable evidence as to Harris or the Interscope Parties. *See* page 6, *supra*. The court then erroneously instructed the jury that "[i]n order to find that the Thicke Parties copied [*Got To Give It Up*], it is not necessary that you find that the Thicke Parties consciously or deliberately copied [the song]. It is sufficient if you find that the Thicke Parties subconsciously copied . . . the Gaye Parties' song." ER 1706. Worded this way, and lacking any reference to substantial

similarity, Instruction 42 allowed the jury to conclude that subconscious copying was a "sufficient" basis for holding Thicke and Williams liable for copying.[14]

Pointing to Instructions 27, 28, and 35, the district court held that it was not "plausible" to construe Instruction 42 as providing an alternative, intent-based path to liability. ER 22. But Instructions 27, 28, and 35 actually confirm rather than dispel the problem. Instruction 27 told the jury only that the Gaye Parties had the burden of proving that "the Thicke Parties copied original elements from the copy-righted work"; nowhere does Instruction 27 mandate that the jury find substantial similarity before returning a verdict for the Gaye Parties. After referring to Instruction 27, Instruction 28 says only that the Gaye Parties "may show" copying by proving access and substantial similarity; it nowhere says that the Gaye parties "must" make such a showing to prevail. ER 1689-90. Instruction 35 then states again that the Gaye Parties "may show" substantial similarity to prove copying. ER 1697-98. The failure of Instructions 27, 28, and 35 to *require* proof of substantial similarity to prove copying, plus the plain statement in Instruction 42 that "to find that the Thicke Parties copied" it "is sufficient" if the jury finds that they "subconsciously copied" the song, plus the Gaye Parties' extensive emphasis on the intent of Thicke and Williams (but of no other counter-defendants) to create a song with the same "groove" as *Got To Give It Up*, *see* ER 236 (opening); ER

---

[14] As the Artists' Brief further explains, Instruction 43 erroneously permitted the jury to assess substantial similarity without first filtering out the unprotected elements from the sound recording of *Got To Give It Up*, which is a further reason why the district court erred in extending the judgment against Thicke and Williams to the Interscope Parties. Artists' Opening Br., 43-45.

1560-62 (closing), together provide a complete and consistent explanation for inconsistency in the general verdicts, and one that is at least as persuasive, if not more persuasive, than the court's speculation that the jury failed to follow accurate instructions and clear argument on distributor liability. In *Westinghouse*, there were no competing explanations for the inconsistency in the verdicts.

*Westinghouse* itself repeatedly invokes the limits of the Seventh Amendment. *See* 106 F.3d at 901-03. Those limits require reversal here. Because these verdicts are susceptible to an inference that the jury found no substantial similarity, "'it is unclear whose ox has been gored;' in other words, it is impossible to tell which verdict is the correct one." *Westinghouse*, 106 F.3d at 902; *see also Floyd v. Laws*, 929 F.2d 1390, 1395-96 (9th Cir. 1990) ("Often juries return general verdicts which seem to defy reason, yet courts have no way to monitor the jurors' thinking processes or test their understanding of the law."). Under a proper application of *Westinghouse*, the jury's general verdict in favor of the Interscope Parties should stand.

### 2. The Gaye Parties Waived Any Objection Based On Inconsistent General Verdicts.

The district court's lack of authority to reconcile inconsistent general verdicts by choosing among them does not mean a court is powerless to address inconsistent general verdicts. The proper remedy is to ask the jury to resume deliberations, with supplemental instructions where appropriate, so that the jury can decide whether or not to stand by the inconsistency. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).

The Gaye Parties were aware of the possibility of inconsistent general verdicts because their counsel had raised the issue with the court prior to jury deliberations. ER 1515-16. Their counsel nevertheless stood by silently after the verdict was read, and remained silent after the Interscope Parties' trial counsel asked the court to poll the jury. ER 1656-60. Immediately after the jury was discharged, the Gaye Parties' counsel asked the court to enter an injunction. ER 1657-58. The Gaye Parties made a strategic judgment to keep and seek to enforce the general verdicts they obtained in their favor, rather than risk losing everything should the jury decide, upon further deliberations following potential additional instruction, that Thicke and Williams were not liable for infringement.

That strategic judgment was the Gaye Parties' prerogative. But the consequence is the waiver of their right to address inconsistency in the general verdicts. Because "district court judges are in a unique position to instruct the jury regarding the meaning of the law, including whether two legal conclusions by the jury are inconsistent," a party waives its right to object to a verdict on these grounds by failing to object before jury discharge. *Kode*, 596 F.3d at 611; *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984). Where the jury is still available, "resubmitting an inconsistent verdict best comports with the fair and efficient administration of justice." *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir. 2003). "Allowing the jury to correct its own mistakes conserves judicial resources and . . . . allows for a resolution of the case according to the intent of the original fact-finder." *Id.* By choosing not to ask the court to resubmit the verdict to the jury, the Gaye Parties waived their objection to the inconsistent ver-

35

dict. *See Kode*, 596 F.3d at 611; *Philippine*, 724 F.2d at 806. For this reason as well, the Court should direct the entry of judgment consistent with the verdict for the Interscope Parties.

## II. THE COURT SHOULD REVERSE THE JUDGMENTS OF IN-FRINGEMENT FOR THE REASONS STATED IN THE ARTISTS' BRIEF

As the Artists' brief explains, the Gaye Parties' infringement claim should never have gone to the jury because there is no substantial evidence that *Blurred Lines* is substantially similar to the protectable elements of the Deposit Copy of *Got To Give It Up*. *See* Artists' Opening Br., 25-41, 53-60. As the Artists' brief further explains, the jury's verdict that Thicke and Williams infringed the Gaye Parties' copyright in *Got To Give It Up* cannot stand because the jury received incorrect instructions on critical issues that precluded them from fairly assessing the infringement claim and that independently warrant a new trial. *See* Artists' Opening Br., 41-48. Because the judgment entered against the Interscope Parties rests entirely on the jury's findings that Thicke and Williams infringed, the Artists' arguments for judgment as a matter of law and, in the alternative, for a new trial, apply equally to the Interscope Parties, who also raised these arguments below, and who incorporate them in the alternative here, by reference.

## CONCLUSION

For the foregoing reasons, the Court should vacate the district court's entry of judgment against the Interscope Parties, and remand the case to the district court to enter judgment consistent with the jury's verdict of no liability; in the alternative, the Interscope Parties join in the Artists' brief and request for relief.

36

Dated: August 23, 2016

/s/ *Mark E. Haddad*

Mark E. Haddad
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000

*Attorneys for Interscope Records,*
*UMG Recordings, Inc., Universal*
*Music Distribution, and Star Trak,*
*LLC*

## REQUEST FOR ORAL ARGUMENT

Counter-Defendants/Appellants Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC (erroneously sued as Star Trak Entertainment) respectfully request that this Court hear oral argument in this case.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached Opening Brief is in 14-point proportionally spaced Times New Roman font, and contains 9,973 words, as counted by my word processing program, exclusive of the portions of the brief excepted by Rule 32(a)(7)(B)(iii).

Dated: August 23, 2016

/s/ *Mark E. Haddad*
Mark E. Haddad
SIDLEY AUSTIN LLP

*Attorneys for Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC*

## STATEMENT OF RELATED CASES

Counter-Defendants/Appellants are not aware of any cases before this Court related to this action.


Dated: August 23, 2016               /s/ *Mark E. Haddad*

Mark E. Haddad
SIDLEY AUSTIN LLP

*Attorneys for Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 23, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 23, 2016

/s/ *Mark E. Haddad*
Mark E. Haddad
SIDLEY AUSTIN LLP

*Attorneys for Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC*

41