# No. 15-56880
## Nos. 16-55089, 16-55626 (consolidated)

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

▶▶◀◀

PHARRELL WILLIAMS, ET AL.,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

FRANKIE CHRISTIAN GAYE, ET AL.,

*Defendants-Appellees-Cross-Appellants.*

*On Appeal From The United States District Court*
*For The Central District of California*
*Hon. John A. Kronstadt, District Judge*
*No. 13-cv-06004 JAK (AGRx)*

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS-CROSS-APPELLEES PHARRELL WILLIAMS, ROBIN THICKE, CLIFFORD HARRIS, JR., AND MORE WATER FROM NAZARETH PUBLISHING, INC.

Howard E. King
Stephen D. Rothschild
Seth Miller
KING, HOLMES, PATERNO
& SORIANO, LLP
1900 Avenue of the Stars,
25th Floor
Los Angeles, California 90067
(310) 282-8989

Kathleen M. Sullivan
Ellyde R. Thompson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
(212) 849-7000

Daniel C. Posner
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 South Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3000

August 23, 2016

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants-Cross-Appellees Pharrell Williams, Robin Thicke, Clifford Harris, Jr., and More Water From Nazareth Publishing, Inc., certify the following:

More Water From Nazareth Publishing, Inc., has no parent company and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT ......................................................4

QUESTIONS PRESENTED................................................................4

STATEMENT OF THE CASE.............................................................5

     A.    Statutory Background...........................................................5

     B.    The Copyrighted Work: "Got To Give It Up" ....................6

     C.    The Accused Work: "Blurred Lines" ..................................7

     D.    The Proceedings Below........................................................7

     E.    The District Court's Summary Judgment Ruling ................8

     F.    The Trial ...........................................................................14

     G.    The District Court's Post-Trial Rulings ............................19

SUMMARY OF ARGUMENT ..........................................................21

STANDARD OF REVIEW ...............................................................22

ARGUMENT ....................................................................................24

I.     THE DISTRICT COURT SHOULD HAVE GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT ..................................24

     A.    The Gayes' Expert Testimony Provided No Relevant Evidence Of Substantial Similarity..................................................26

     B.    The District Court Erred In Failing To Compare The Two Works ...............................................................................27

     C.    "Blurred Lines" Is Not Substantially Similar To "Got To Give It Up" As A Matter Of Law ..............................................30

          1.    No Substantial Similarity In "Signature Phrases" ...................32

          2.    No Substantial Similarity In "Four-Note Hooks".....................35

          3.    No Substantial Similarity In "Four-Bar Bass Lines"................36

          4.    No Substantial Similarity In "Four-Note Vocal Melody" ........37

          5.    No Substantial Similarity In "Harmonic Structure" ................37

iii

II.  ALTERNATIVELY, THE JUDGMENT SHOULD BE VACATED AND THE CASE REMANDED FOR NEW TRIAL ................................... 38

    A.  Two Crucial Jury Instructions On Copyright Infringement Were Erroneous........................................................................................ 38

        1.  Instruction 42 Improperly Invited Consideration Of "Subconscious Copying" ........................................................ 38

        2.  Instruction 43 On "Substantial Similarity" Erroneously Failed To Filter Out Unprotected Elements............................. 40

    B.  The District Court Abused Its Discretion In Admitting Irrelevant And Prejudicial Evidence ................................... 44

        1.  Finell's Testimony Was Improperly Based On Unprotected Elements ............................................................... 44

        2.  Monson's Testimony Was Improperly Based On Unprotected Elements ............................................................... 46

    C.  A New Trial Is Warranted Because The Verdict Was Against The Great Weight Of The Evidence..................................... 47

        1.  The Verdict Is Not Supported By Any Evidence Of Substantial Extrinsic Similarity ................................. 47

        2.  The Verdict Is Not Supported By Any Evidence Of Substantial Intrinsic Similarity ................................. 50

III.  THE AWARDS OF ACTUAL DAMAGES, PROFITS, AND A RUNNING ROYALTY SHOULD BE REVERSED OR VACATED......... 51

    A.  The Award Of Actual Damages Is Not Supported By Any Competent Evidence.................................................... 51

        1.  Stern's Testimony Regarding Actual Damages Should Have Been Excluded................................................. 52

        2.  Stern's Testimony Fails To Support The Actual Damages Award.......................................................... 54

    B.  The Awards Of Profits Are Not Supported By Any Competent Evidence ................................................... 55

    C.  The Award Of A Running Royalty Is Not Supported By Any Competent Evidence.................................................... 56

IV.  THE JUDGMENT AGAINST HARRIS SHOULD BE REVERSED AS CONTRARY TO THE JURY VERDICT ............................. 57

CONCLUSION ....................................................................................58

REQUEST FOR ORAL ARGUMENT ..................................................59

STATEMENT OF RELATED CASES .................................................60

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C) AND CIRCUIT RULE 32-1..................................................................61

CERTIFICATE OF SERVICE ............................................................62

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abend v. MCA, Inc.*,
  863 F.2d 1465 (9th Cir. 1988), *aff'd on other grounds*, 495 U.S. 207 (1990)...56

*Allen v. Destiny's Child*,
  No. 06-c-6606, 2009 WL 2178676 (N.D. Ill. Jul. 21, 2009).............................35

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ......................................................................31, 36

*Banuelos v. Constr. Laborers' Trust Funds for S. Cal.*,
  382 F.3d 897 (9th Cir. 2004) ......................................................................22, 25

*Batiste v. Najm*,
  28 F. Supp. 3d 595 (E.D. La. 2014)..................................................................28

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ............................................................29

*Brown Bag Software v. Symantec Corp.*,
  960 F.2d 1465 (9th Cir. 1992) .........................................................................29

*Central Office Tel., Inc. v. Am. Tel. & Tel. Co.*,
  108 F.3d 981 (9th Cir. 1997), *rev'd on other grounds*, 524 U.S. 214 (1998) ....51

*Cottrill v. Spears*,
  No. 02-cv-3646, 2003 WL 21223846 (E.D. Pa. May 22, 2003) .......................33

*Dang v. Cross*,
  422 F.3d 800 (9th Cir. 2005) ......................................................................42, 43

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) .........................................................................50

*EEOC v. Pape Lift, Inc.*,
  115 F.3d 676 (9th Cir. 1997) ...........................................................................23

*Escriba v. Foster Poultry Farms, Inc.*,
  743 F.3d 1236 (9th Cir. 2014) .............................................................25

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ...............................................................23

*Ets-Hokin v. Skyy Spirits Inc.*,
  323 F.3d 763 (9th Cir. 2003) ...............................................................30

*F.B.T. Prods., LLC v. Aftermath Records*,
  621 F.3d 958 (9th Cir. 2010) ...............................................................23

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ...............................................................51

*Francescatti v. Germanotta*,
  No. 11-cv-5270, 2014 WL 2767231 (N.D. Ill. Jun. 17, 2014) ...........28

*Fred Fisher, Inc. v. Dillingham*,
  298 F. 145 (S.D.N.Y. 1924)...................................................................39

*Funky Films, Inc. v. Time Warner Entm't Co.*,
  462 F.3d 1072 (9th Cir. 2006) .............................................................29

*Gantt v. City of L.A.*,
  717 F.3d 702 (9th Cir. 2013) ...............................................................23

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir. 1988) ..............................................................31

*Gaylord v. United States*,
  777 F.3d 1363 (Fed. Cir. 2015) ......................................................52, 57

*Guerra v. Sutton*,
  783 F.2d 1371 (9th Cir. 1986) .............................................................24

*Harper House, Inc. v. Thomas Nelson, Inc.*,
  889 F.2d 197 (9th Cir. 1989) ....................................................41, 42, 43

*Harper v. City of L.A.*,
  533 F.3d 1010 (9th Cir. 2008) ....................................................44, 46

*Hunter v. Cnty. of Sacramento*,
  652 F.3d 1225 (9th Cir. 2011) ............................................................23

*Jarvis v. K2 Inc.*,
  486 F.3d 526 (9th Cir. 2007) ..............................................................54

*Jean v. Bug Music, Inc.*,
  No. 00-cv-4022, 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002) ...........35

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994) ..............................................................30

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984) ............................................................28

*Mattel, Inc. v. MGA Entm't, Inc.*,
  616 F.3d 904 (9th Cir. 2010) ..............................................................31

*McDonald v. Multimedia Entm't, Inc.*,
  No. 90-cv-6356, 1991 WL 311921 (S.D.N.Y. Jul. 19, 1991) ...........35

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ..............................................................23

*Narell v. Freeman*,
  872 F.2d 907 (9th Cir. 1989) ..............................................................29

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2003) .............................................26, 27, 34

*Olson v. Nat'l Broad. Co.*,
  855 F.2d 1446 (9th Cir. 1988) ............................................................26

*Oracle Corp. v. SAP AG*,
  765 F.3d 1081 (9th Cir. 2014) ...........................................23, 47, 52, 53

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir.  2004) .............................................................54

*Rice v. Fox Broad. Co.*,
  330 F.3d 1170 (9th Cir. 2003) ............................................................29

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) ...........................................................23

*Satava v. Lowry*,
   323 F.3d 805 (9th Cir. 2003) .............................................................31

*Smith v. Jackson*,
   84 F.3d 1213 (9th Cir. 1996) .......................................................24, 30

*Swirsky v. Carey*,
   376 F.3d 841 (9th Cir. 2004) ............................................. 24, 25, 28, 33, 35, 50

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) ..................................................24, 39, 50

*Tisi v. Patrick*,
   97 F. Supp. 2d 539 (S.D.N.Y. 2000) .................................................29

*Traxler v. Multnomah Cty.*,
   596 F.3d 1007 (9th Cir. 2010) ..........................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ........................................................52

*VMG Salsoul, LLC v. Ciccone*,
   824 F.3d 871 (9th Cir. 2016) ............................................................51

*Velez v. Sony Discos*,
   No. 05-cv-0615, 2007 WL 120686 (S.D.N.Y. Jan. 16, 2007)............................28

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2006) ............................................................24

*Warner Bros. Inc. v. Am. Broad. Cos., Inc.*,
   654 F.2d 204 (2d Cir. 1981) .............................................................34

*Wilson Arlington Co. v. Prudential Ins. Co.*,
   912 F.2d 366 (9th Cir. 1990) ............................................................25

## **Statutes and Rules**

17 U.S.C. § 101 .......................................................................4, 5

17 U.S.C. § 102 ...............................................................................................5

17 U.S.C. § 303(b) ..........................................................................................5

28 U.S.C. § 1291 .............................................................................................4

28 U.S.C. § 1331 .............................................................................................4

Copyright Act of 1909, 35 Stat. 1075, §§ 9-12 ..............................................5

Fed. R. Evid. 401 ..........................................................................................45

Fed. R. Evid. 403 ..........................................................................................45

Fed. R. Evid. 702 ..........................................................................................45

Fed. R. Civ. P. 50 ..........................................................................................57

Fed. R. Civ. P. 50(a) .....................................................................................19

Fed. R. Civ. P. 50(b) .....................................................................................19

Fed. R. Civ. P. 59(a) .....................................................................................23

## Other Authorities

*7 Reasons The 'Blurred Lines' Verdict Should Have Everyone Spooked*, BET.com (Mar. 13, 2015), http://www.bet.com/music/photos/2015/03/7-reasons-the-blurred-lines-verdict-should-have-everyone-spooked.html#!031315-music-questlove ............................................................................................2

Alexander L. Ringer, "Melody," *Grove Music Online*, http://www.oxfordmusiconline.com ...................................................9

*"Blurred Lines" Verdict Would Rock Amadeus And Other Great Composers*, LOS ANGELES TIMES (March 14, 2015), http://www.latimes.com/entertainment/arts/la-et-cm-blurred-lines-classical-notebook-20150314-column.html ....................2

Bruce Haynes & Peter Cooke, "Pitch," *Grove Music Online*, http://www.oxfordmusiconline.com ...................................................9

Carl Dahlhaus, "Harmony," *Grove Music Online*, http://www.oxfordmusiconline.com ...................................................9

"Chord," *Grove Music Online*, http://www.oxfordmusiconline.com........................9

David Fallows, "Parlando," *Grove Music Online*,
http://www.oxfordmusiconline.com .................................................................16

*Little To Be Happy About In A Win For Marvin Gaye*," FINANCIAL TIMES (Mar. 20,
2015), http://www.ft.com/cms/s/0/0a7230cc-cf12-11e4-893d-
00144feab7de.html#axzz4HnQuQ25y ...............................................................1

1 NIMMER ON COPYRIGHT § 2.05[A] (2016) ............................................................6

4 NIMMER ON COPYRIGHT §13.03[A][4] ................................................................31

Paul Schrodt, *The $5 Million 'Blurred Lines' Legal Fight Over The Song's 'Vibe'
Could Permanently Change The Music Industry*," BUSINESS INSIDER (Dec. 15,
2015), http://www.businessinsider.com/blurred-lines-case-music-copyright-
2015-12 ............................................................................................................1

"Scale," *Grove Music Online*, http://www.oxfordmusiconline.com ......................11

*Skidmore v. Led Zeppelin*,
C.D. Cal. Case No. CV 15-03462-RGK(AGRx), Dkt. 273 (June 23, 2016) .....43

Tim Wu, *Why the 'Blurred Lines' Copyright Verdict Should Be Thrown Out*, THE
NEW YORKER (Mar. 12, 2015), http://www.newyorker.com/culture/culture-
desk/why-the-blurred-lines-copyright-verdict-should-be-thrown-out .................1

U.S. Copyright Office, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES
§ 313.4(B) (3d ed. 2014)...................................................................................34

## PRELIMINARY STATEMENT

This is an appeal from a judgment that the popular 2013 song "Blurred Lines" by musical artists Pharrell Williams, Robin Thicke and Clifford Harris, Jr. infringes the copyright in Marvin Gaye's 1977 song "Got To Give It Up." After a jury trial in the District Court for the Central District of California, the jury entered a verdict against Williams and Thicke, and, on post-trial motions, the district court (Kronstadt, J.) entered judgment against them and also against musician Clifford Harris and several record companies, awarding damages, profits and royalties to Gaye's heirs. This outcome created international press coverage and widespread expressions of concern by members of the music community that, if left to stand, the "Blurred Lines" verdict would chill musical creativity and inhibit the process by which later artists draw inspiration from earlier artists to create new popular music.[1]

---

[1] *See, e.g.*, Tim Wu, *Why the "Blurred Lines" Copyright Verdict Should Be Thrown Out*, THE NEW YORKER (Mar. 12, 2015), http://www.newyorker.com/culture/culture-desk/why-the-blurred-lines-copyright-verdict-should-be-thrown-out ("[T]he borrowing of styles is too important an expressive freedom to be subject to federally enforced censorship."); *Little To Be Happy About In A Win For Marvin Gaye*, FINANCIAL TIMES (Mar. 20, 2015), http://www.ft.com/cms/s/0/0a7230cc-cf12-11e4-893d-00144feab7de.html#axzz4 HnQuQ25y ("Great music is stifled at birth when composers have to conduct a paranoid audit of their subconscious against being too greatly inspired by a predecessor."); Paul Schrodt, *The $5 million "Blurred Lines" Legal Fight Over The Song's "Vibe" Could Permanently Change The Music Industry*, BUSINESS INSIDER (Dec. 15, 2015), http://www.businessinsider.com/blurred-lines-case-music-copyright-2015-12 (noting concern that verdict's "consequences could have

The judgment should be reversed because "Blurred Lines" is not substantially similar to "Got To Give It Up" as a matter of law. Under the Copyright Act of 1909, the copyright on "Got To Give It Up" extends only to the **sheet music** for the song as registered and deposited at the Copyright Office, and **not** to the compositional elements of its **sound recording**. The deposit copy of "Got To Give It Up" that its owners chose to file is merely a "lead sheet"—that is, a skeletal sketch of the song's main melody, lyrics, and chords. The deposit copy of "Got To Give It Up" omits percussion parts, keyboard parts, backup vocals, background noise and bass lines and other aspects of the sound recording, which are not protected under the copyright.

This case thus should have been a spare and simple exercise in comparing "Blurred Lines" to the few musical elements that appear in the deposit copy for "Got To Give It Up." No reasonable jury could have found substantial similarity

---

far-reaching and potentially troubling effects on artists who are nothing like Thicke and Pharrell, changing how new music is made and released and who really gets to own it"); *7 Reasons the "Blurred Lines" Verdict Should Have Everyone Spooked*, BET.com (Mar. 13, 2015), http://www.bet.com/music/photos/2015/03/7-reasons-the-blurred-lines-verdict-should-have-everyone-spooked.html#!031315-music-questlove (noting that "Inspiration Can Now Cost You Millions" and "The Feel of a Song Can Now Be Copyrighted"); *"Blurred Lines" Verdict Would Rock Amadeus And Other Great Composers*, LOS ANGELES TIMES (Mar. 14, 2015), http://www.latimes.com/entertainment/arts/la-et-cm-blurred-lines-classical-notebook-20150314-column.html ("Pop music artists and critics are properly incensed over the 'Blurred Lines' mess.").

based on that comparison, as the Court can hear for itself by listening to the two. *Compare* ER2445 (audio file of "Blurred Lines" sound recording) *with* ER2307 (audio file created from the deposit copy of "Got To Give It Up"). The district court therefore should have entered summary judgment of non-infringement, and the case never should have gone to a jury.

What happened instead was a cascade of legal errors warranting this Court's reversal or vacatur for new trial. At summary judgment, the district court entertained expert testimony by musicologists for the Gayes who based their opinions entirely on the sound recording, not the deposit copy. The court correctly filtered out non-deposit-copy and generic musical features from their testimony, but then erroneously failed to compare what remained to "Blurred Lines." At trial, the district court made things worse. While correctly excluding the "Got To Give It Up" sound recording itself, the court erroneously allowed the Gayes' experts to testify about the sound recording anyway, including by playing their own musical excerpts based on the sound recording. The court then instructed the jury that it could consider all this testimony in its substantial-similarity analysis, failing to instruct them to consider only the protectable elements of the copyrighted work and indeed pointing them explicitly to elements omitted from the deposit copy.

For all these reasons, the judgment below should be reversed, or at a minimum, vacated and remanded for new trial.

The damages and infringers' profits awards independently warrant reversal or vacatur because unsupported by admissible evidence, and the judgment against Harris independently warrants reversal because the judge was not free to disregard the jury's finding that he did not infringe.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 17 U.S.C. §§ 101 *et. seq.* This Court has jurisdiction pursuant to 28 U.S.C. § 1291. On December 7, 2015, Appellants Williams, Thicke, Harris, and Williams's publishing company, More Water From Nazareth Publishing, Inc., filed a timely Notice of Appeal. ER155.

## QUESTIONS PRESENTED

1.     Should the judgment be reversed because the district court should have entered summary judgment of no substantial similarity between "Blurred Lines" and "Got to Give It Up" as a matter of law?

2.     Should the judgment be vacated and the case remanded for new trial because the district court (a) erred in its jury instructions on key elements of copyright infringement, (b) improperly admitted evidence irrelevant to the protected elements of "Got To Give It Up," and (c) entered a judgment against the great weight of the evidence?

3.     Should the monetary awards of $3,188,524 in damages, $2,125,822.84 in profits, and a running royalty of 50% of songwriter and publishing revenue be reversed or vacated as unsupported by sufficient evidence?

4.     Should the entry of judgment of copyright infringement against Harris be reversed because contrary to the jury verdict in his favor?

### STATEMENT OF THE CASE

**A.     Statutory Background**

Because "Got To Give It Up" was created before the effective date of the 1976 Copyright Act ("1976 Act"), this case is governed by the Copyright Act of 1909, 35 Stat. 1075, 17 U.S.C. § 101 *et seq.* (1976 ed.) ("1909 Act").  The 1976 Act provides copyright protection for "original works of authorship fixed in any tangible medium of expression," including a musical composition fixed in a sound recording. 17 U.S.C. §§ 101, 102. In contrast, the 1909 Act affords copyright protection to a published work only if it is published with a copyright notice affixed and then registered with the Copyright Office along with a deposit copy of the work.  35 Stat. 1075, §§ 9-12; ER117-19.

Under the 1909 Act, a sound recording does ***not*** constitute publication of a musical composition.  *See* 17 U.S.C. § 303(b).  Copyright in a published composition under the 1909 Act can be secured only by publishing a written copy (*i.e.*, sheet music) with proper copyright notice affixed and then registering the

composition and depositing the written copy at the Copyright Office. *See* M. Nimmer & D. Nimmer, 1 NIMMER ON COPYRIGHT § 2.05[A] (2016) ("Nimmer") ("[I]n order to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form.").

### B. The Copyrighted Work: "Got To Give It Up"

Marvin Gaye made a sound recording of the musical composition "Got To Give It Up" in 1977 that became a popular hit. ER2449. After Gaye died in 1984, Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III ("the Gayes") inherited the copyrights in his compositions, including in "Got To Give It Up." ER300-01, ER2308.

Because governed by the 1909 Act, the copyright in the composition "Got To Give It Up" is not for the sound recording but rather for the sheet music registered and deposited with the Copyright Office in 1977. Music publisher Jobete Music Company, Inc., made the registration, listing Gaye as the author. ER2446. Jobete deposited with the registration six pages of handwritten sheet music for "Got To Give It Up." ER2410-16. There is no statutory requirement governing the level of detail in such sheet music. The deposit copy Jobete chose to file for "Got To Give It Up" is a simple "lead sheet" that sketches the main vocal melody, lyrics, and chord symbols of the song. ER546, ER703, ER774, ER777,

ER828, ER2012, ER2410-16. It thus omits a great number and variety of musical elements heard in the sound recording.

### C. The Accused Work: "Blurred Lines"

Williams, Thicke, and Harris are well-known musical recording artists and composers. ER2449-59, ER2489. Williams and Thicke wrote and recorded "Blurred Lines" in June 2012. ER1411, ER1425-26. Harris independently wrote and recorded a rap verse to add to the recording seven months later. ER438, ER1379, ER1422.

The "Blurred Lines" sound recording (ER2432, ER2444-45) was released in 2013 and became a significant hit (ER2449-51), as did a music video of "Blurred Lines" released the same year (ER1291-92, ER1348-51).

### D. The Proceedings Below

In this action, the Gayes allege that "Blurred Lines" infringes the Gayes' copyright in "Got To Give It Up." After hearing the sound recording of "Blurred Lines," the Gayes made an infringement demand on Williams and Thicke. ER304, ER307, ER313-15, ER323-26. Williams, Thicke, and Harris filed an action for declaratory judgment of non-infringement. ER2288. The Gayes filed counterclaims for infringement against, among others, Williams, Thicke, Harris, More Water for Nazareth, Inc., and the record companies UMG Recordings, Inc.

("UMG"), Universal Music Distribution, Star Trak Entertainment, and Interscope Records (collectively, the "'Blurred Lines' parties"). ER2206, ER2224.[2]

The Gayes attached to their counterclaim a preliminary report by their retained musicology expert Judith Finell, who purported to identify "substantially similar features" between "Blurred Lines" and "Got To Give It Up." ER2271, ER2285. Finell based her opinion in the preliminary report solely on the sound recording of "Got To Give It Up" and did not even look at the deposit copy of the song at the time. ER698-702.

### E.  The District Court's Summary Judgment Ruling

In an order entered October 30, 2014, the district court denied the "Blurred Lines" parties' motion for summary judgment of non-infringement. ER133. Relying on the opinion of their musicology expert Sandy Wilbur (ER2116-89), the "Blurred Lines" parties argued that "Blurred Lines" is not substantially similar to "Got To Give It Up" as a matter of law. Wilbur focused on the musical elements that appear in the deposit copy of "Got To Give It Up," not on what might be heard in the sound recording. ER2125. She also excluded any elements that are unprotectable because "commonplace and generic and available to all composers to employ." ER2133 (*e.g.*, "repeating a pitch in a melodic phrase"); ER2140

---

[2] The Gayes alleged as a second counterclaim that the Thicke song "Love After War" infringes the Gayes' copyright in the composition "After the Dance." The "Blurred Lines" parties prevailed on this counterclaim at trial, and judgment was entered in their favor. ER3, ER2206, ER2224.

("mov[ing] up in pitch then down again"); ER2152 (playing the first degree of a scale in the bass line).

Having done that filtration, Wilbur opined that the two songs are not substantially similar because they share no melody,[3] no three chords in common[4] and no lyrics (ER2120-21); have different structures (placement of chorus, etc.) (ER2122-23); and have different harmonic progressions[5] because they share "no sequence of two chords played in the same order and for the same number of measures (duration)" (ER2121). For example, the harmonic progression for the first 16 bars is illustrated below:

---

[3]    "Melody" is the combination of musical pitch and rhythm. Alexander L. Ringer, "Melody," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016). Pitch is a matter of a musical note's placement on a scale. Bruce Haynes & Peter Cooke, "Pitch," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016). Rhythm is a matter of the duration and timing of the pitches or percussive sounds. Justin London, "Rhythm," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016).

[4]    A "chord" is a combination of musical notes played simultaneously, denoted by the letters of the scale (A-G) with certain variations denoted by numbers. "Chord," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016).

[5]    "Harmony" is the musical result of several pitches being played and/or sung together at the same time to provide a combined musical sound. Carl Dahlhaus, "Harmony," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016).

| Measure | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Give It Up | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | D7 | E7 | A7 | B7 | D7 | E7 | A7 | B7 |
| Blurred | A | A | A | A | E | E | E | E | A | A | A | A | E | E | E | E |

ER2122.

The district court nonetheless denied summary judgment, ruling that the Gayes had raised triable issues of substantial similarity. ER133. The court ruled that the copyright in "Got To Give It Up" is governed by the 1909 Copyright Act and thus limited to the deposit copy, and that any alleged similarities not based on the deposit copy must be filtered out of the comparison. ER116-21, ER126-30. But the court nonetheless ruled that disputed issues of substantial similarity remained. ER133.

In reaching that conclusion, the court relied on the declarations of the Gayes' musicology experts Finell and Ingrid Monson. Finell resubmitted her preliminary report with her declaration (ER2002), admitting that she had relied solely on the sound recording of "Got To Give It Up" in preparing that report but insisting that "nothing in the deposit copy changes my findings or conclusions" (ER2012). She repeated the opinion from her preliminary report that, whether or not any individual elements were similar, the "aggregation of similar features in the two works results in their two substantially similar 'Constellations.'" ER2004; *see also* ER2046.

10

Finell's declaration (and attached preliminary report) did not suggest that the two songs share any lyrics, harmonies, choruses, or overall structures. Finell nonetheless purported to find eight melodic or other similarities between the sound recordings of "Got To Give It Up" and "Blurred Lines," which she labeled and described as follows:

    i.    ***"Signature phrases"***: a 10-note vocal melody in "Got To Give It Up" using scale degrees [6] 5-5-5-5-6-1-2-1-5-6 that appears once at :19 seconds into the sound recording and is sung to the lyrics "*I used to go out to parties*"; and a 12-note vocal melody in "Blurred Lines" using scale degrees 3-3-#2-3-5-6-1-1-1-5-4-3 that appears once at the :47 mark and is sung to the lyrics "*And that's why I'm gon' take a good girl.*" ER2013-16, ER2047-50, ER2199-2205.

    ii.    ***"Hooks"***: a four-note melodic sequence in "Got To Give It Up" using scale degrees 6-1-2-1 sung to the lyrics "*Keep on dancin'*"; and a four-note sequence in "Blurred Lines" using scale degrees 6-1-1-1 sung to the lyrics "*take a good girl.*" ER2016, ER 2050-51.

---

[6] A "scale degree" signifies the place of a given pitch in any given scale, which is a sequence of notes in ascending or descending order of pitch. "Scale," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016); ER2177. There are generally eight musical pitches in a scale. ER2177. For any particular scale, each pitch may be assigned a number from 1 to 8. For example, the well-known tones "do-re-mi" are scale degrees 1, 2 and 3. *Id.* In the key of C, scale degree 1 is C, but in the key of G, scale degree 1 is G. ER2175.

iii. ***"Hooks with backup vocals"***:  melodic backup vocal parts that accompany the respective songs' supposed "hooks."  ER2017, ER2051-52.

iv. ***"Theme X"***:  a four-note melody in "Got To Give It Up" using scale degrees 3-3-#2-3 sung in the back-up vocals to the lyrics "*Dancin' lady*"; and melodic phrases in "Blurred Lines" like 3-#2-3-3 sung to the lyrics "*If you can't hear*" and 3-3-#2-3-#2-3 sung to the lyrics "*Okay now he was close*."  ER2018-20, ER2052-55.

v. ***"Back-up hooks"***:  melodic phrases in "Got To Give It Up" using the last three scale degrees in Theme X (3-#2-3); and a three-note melodic phrase in "Blurred Lines" using scale degrees 4-#4-5, sung to the lyrics "*Hey, hey, hey*."  ER2020-21, ER2055-56.

vi. ***"Bass melodies"***:  (a) a four-bar bass melody in each song (ER2021-24, ER2056-57); and (b) a five-note "descending bass melody" in "Got To Give It Up" and a nine-note descending bass melody in "Blurred Lines" (ER2024-26, ER2057-58).

vii. ***"Keyboard parts"***:  (a) keyboard rhythms and (b) keyboard pitches in both songs.  ER2026-28, ER2058-59.

viii. ***"Unusual percussion choices"***:  cowbell parts and the use of an open hi-hat cymbal in each song.  ER2028, ER2059-60.

12

In addition to her "constellation" of eight purported similarities, Finell identified four "additional distinctive similarities": "scoring and arrangement choices" that "use the same instrumentation"; the use of "distinctive falsetto" in the vocal parts; the omission of a guitar; and the inclusion of "party noises." ER2028-30, ER2060-61.

The Gayes' other expert Monson also based her opinion solely on the sound recording of "Got to Give it Up," stating that it would be "musically misleading" to "limit the composition" to the deposit copy. ER2074. Monson identified a supposed "constellation of commonalities," including purported harmonic similarity and use of hand percussion, disco beats, bass line rhythms, electric piano rhythms, and vocal themes. ER2079-81, ER2089-90. Admitting that "[e]ach similarity" she identified "taken separately might not seem significant," Monson nonetheless found similarity in "the combination of choices made in both recordings." ER2089.

In the summary judgment order, the district court filtered out as unprotected multiple elements identified by Finell and Monson but not included in the deposit copy of "Got To Give It Up." The district court filtered out six elements or sub-elements of Finell's purported "constellation": (iii) "hooks with backup vocals," (iv) "Theme X," (v) "backup hooks," (vi.a) "descending bass melody," (vii.a)

"keyboard rhythms"[7] and (viii) "unusual percussion choices. " ER122-30. The district court also filtered out all four of Finell's "additional distinctive similarities." ER130. As to Monson's purported similarities, the court filtered out all but two: a purported "harmonic similarity" in a 16-bar chord progression and a supposed "melodic similarity" between a four-note "portion of the lead vocal melody of 'Got to Give It Up' and a melodic line in 'Blurred Lines.'" ER130-32. Through this filtration, the district winnowed the protectable elements of "Got To Give It Up" down to five: "the[] 11-note signature phrase, four-note hook, four-bar bass line, 16-bar harmonic structure and four-note vocal melody." ER133. The court, however, stopped its analysis there and did not undertake any comparison of those five elements to any corresponding features of "Blurred Lines." Instead, the court concluded that, in light of "disputes, supported by competing expert analyses, as to the similarity of individual elements of each song," both protectability and similarity were matters for the jury. ER133.

## F. The Trial

The case proceeded to a seven-day jury trial in early 2015, resulting in a jury verdict on March 10, 2015, finding Williams and Thicke liable for copyright infringement but finding no liability for Harris, UMG, Universal Music

---

[7] The district court also filtered out element (vii.b) "keyboard pitches" because, even though the deposit copy contained a repeated A7 chord, "the repetition of a single, common chord is not a sufficiently original expression to merit copyright protection." ER130.

Distribution, Star Trak Entertainment, or Interscope Records. ER60-61. The jury found Williams' and Thicke's infringement not willful. ER63. The jury awarded the Gayes $4 million in damages, and found that Williams had received $1,610,455.31 and Thicke $1,768,191.88 in profits from the infringement. ER62.

The infringement evidence at trial consisted largely of expert testimony. Because the district court had ruled that the "Got To Give It Up" copyright is limited to the deposit copy, it granted pretrial motions excluding the sound recording of the song from the trial, but allowed the Gayes to present modified versions of the sound recording based on musical elements they asserted were included in the deposit copy. ER100-05. The district court denied pretrial motions to exclude Finell's and Monson's testimony as improperly based on the sound recording, and denied a *Daubert* hearing on Finell's opinion. ER106, ER175-76, ER496-97.

Finell testified over two days. ER468-505, ER545-683, ER698-784, ER790-834. Rather than illustrate her testimony with the actual deposit copy of "Got To Give It Up," she was permitted to rely instead on her own transcriptions of the sound recording made before she had ever seen the deposit copy. ER493, ER550-57, ER565-66, ER770-71, ER2417-59. While admitting that her transcriptions departed from the deposit copy and that she added elements that did not appear there (ER707-11, ER734-41, ER749-50, ER758-59, ER773-74, ER778-

15

80, ER792-94, ER803-08), Finell suggested that they were "implied" or would be "understood" by a musician to be present in the deposit copy (ER772-77, ER781-83, ER796-98).

Beyond asserting substantial similarities in the "signature phrases," "hooks" and four-bar bass melodies that the district court had found at summary judgment included in the deposit copy, Finell also was permitted at trial to assert similarities in non-deposit-copy elements that the district court had "filtered out" at summary judgment—including "Theme X," the descending bass line, and keyboard parts. ER604-27, ER633-41, ER641-48. She was even permitted to testify that the **"heartbeat"** of "Got To Give It Up" was comprised of such non-deposit-copy elements as the descending bass line and keyboard rhythms. ER558-61, ER621, ER629, ER642, ER661. And Finell was permitted to testify to alleged similarities she had never proposed in her earlier report or declaration, including supposed similarities in "word painting" and the placement of a rap section in "Blurred Lines" and "parlando"[8] section in "Got To Give It Up." ER648-55, ER657-64, ER830-31.

The "Blurred Lines" parties objected repeatedly to Finell's testimony as to musical elements absent from the deposit copy, with the court eventually granting

---

[8] "Parlando" is a musical term for a spoken word section of music. David Fallows, "Parlando," *Grove Music Online*, http://www.oxfordmusiconline.com (last visited Aug. 21, 2016).

16

them a "standing objection" to such testimony.  ER495-97, ER617, ER621-22, ER629.

The district court also permitted the Gayes' expert Monson to testify about "mash-ups" she had created by combining bass and keyboard parts present in the sound recording (but not in the deposit copy) of "Got To Give It Up" with vocal parts from "Blurred Lines" to show their supposed compatibility.  ER864-72, ER899-903.  The district court rejected a pretrial motion by the "Blurred Lines" parties to exclude such mash-ups.  ER107; *see* ER104-05.

Wilbur, the "Blurred Lines" parties' expert, countered Finell's and Monson's testimony.  Unlike Finell and Monson, Wilbur focused solely on the deposit copy of "Got To Give It Up" and testified that the two songs are not substantially similar.  ER1009-1104, ER1110-33.  Wilbur prepared and testified about a sound recording she had prepared from the deposit copy of "Got To Give It Up," which excluded elements that nowhere appear there.  ER1048-49, ER2307.

The district court allowed the Gayes, over the "Blurred Lines" parties' objection (ER107, ER1327-28), to present evidence based on press statements suggesting that Williams and Thicke were inspired by Marvin Gaye, admired "Got To Give It Up," and wanted to create a song with a similar "groove" (ER383-90, ER1445-48).

With respect to damages, the district court allowed the Gayes' licensing expert Nancie Stern to testify that a hypothetical license fee for the use of "Got To Give It Up" prior to the release of "Blurred Lines" would have been 50% of all revenue from the "Blurred Lines" composition—even though she based her opinion initially on the "Got To Give It Up" sound recording and cited no comparable licenses for the song. ER93, ER107, ER529, ER542-43, ER1768-75, ER1993.

In the jury instructions on copyright infringement, the district court, over the "Blurred Lines" parties' objections (ER1884-85, ER1929), instructed the jury that:

> In order to find that the "Blurred Lines" parties copied ["Got To Give It Up"], it is not necessary that you find that the "Blurred Lines" parties consciously or deliberately copied [the song]. It is sufficient if you find that the "Blurred Lines" parties subconsciously copied [the song].

ER88; *see* ER21.

The court also crafted its own instruction for "substantial similarity" (ER1738), which, contrary to the "Blurred Lines" parties' proposed instruction (ER1931), affirmatively directed the jury to consider non-deposit-copy elements like "Theme X, bass melodies, keyboard parts, word painting, lyrics, rap v. parlando":

> Extrinsic similarity is shown when two works have a similarity of ideas and expression as measured by external, objective criteria. To make this determination, ***you must consider*** the elements of each of the works and decide if they are substantially similar. . . . There has

18

been testimony and evidence presented by both sides on this issue, including by expert witnesses, as to such matters as . . . the so-called signature phrase, hook, Theme X, bass melodies, keyboard parts, word painting, lyrics, rap v. parlando; . . . . The Gaye Parties do not have to show that each of these individual elements is substantially similar, but rather that there is enough similarity between a work of the Gaye Parties and . . . an allegedly infringing work of the "Blurred Lines" parties to . . . comprise a substantial amount.

Intrinsic similarity is shown if an ordinary, reasonable listener would conclude that the total concept and feel of the Gaye Parties' work and the "Blurred Lines" parties' work are substantially similar.

ER88-89; *see* ER22-23.

### G. The District Court's Post-Trial Rulings

In an order entered July 14, 2015, the district court denied Williams' and Thicke's post-trial motion for judgment as a matter of law ("JMOL") or new trial, but remitted the damages to $3,188,527.50 and the award of profits against Williams to $357,630.96. ER58-59. The court ruled that Williams and Thicke had waived their right to seek JMOL under Rule 50(b) because they had not moved pre-verdict under Rule 50(a), and that sufficient evidence existed to defeat any finding of plain error. ER7-8, ER29. The court found their instructional objections preserved but found no error in Instructions 42 or 43. ER20-26. The court further found no evidentiary errors, ruling that Finell's testimony based on elements of "Got To Give It Up" that were only in the sound recording "goes to the weight and not the admissibility of the testimony." ER12.

The district court granted the Gayes' motion for JMOL against Harris and the record companies UMG, Universal Music Distribution, Star Trak Entertainment, and Interscope Records. ER47-48. While the jury found no liability as to any of those parties, the court concluded that the lack of a jury instruction regarding liability for distributing an infringing work had caused that verdict. The court reached this result even though Harris never distributed "Blurred Lines" but instead was a composer and performer like Williams and Thicke. ER2461. The court denied the Gayes' request for injunctive relief because the Gayes "failed to show irreparable harm." ER50-52. But the court awarded the Gayes a "running royalty" of 50% of future writer and publishing royalties from "Blurred Lines." ER53, ER58-59. The court also entered a declaratory judgment against Williams and Thicke that any past and ongoing reproduction or exploitation of "Blurred Lines" infringes the Gayes' copyright. ER43.

In an order entered December 2, 2015, the district court entered judgment in favor of the Gayes, awarding (i) $3,188,527.50 in actual damages; (ii) infringers' profits of $1,768,191.88 against Thicke and $357,630.96 against Williams; and (iii) a running royalty of 50% of songwriter and publishing revenues received by Williams, Thicke, and Harris from "Blurred Lines" after entry of judgment. ER2-3.

## SUMMARY OF ARGUMENT

**I**. This Court should reverse the judgment below because the district court should have granted summary judgment of non-infringement. The court erred at summary judgment in considering expert opinions that were inadmissible because premised on unprotected elements of "Got To Give It Up," in failing to compare "Blurred Lines" to the few protectable elements of "Got To Give It Up" that remained after unprotectable elements were filtered out of the Gayes' expert testimony, and in denying summary judgment where each and every remaining protectable element of "Got To Give It Up" is objectively dissimilar to corresponding elements of "Blurred Lines."

**II**. If judgment of non-infringement is not entered, then the judgment should be vacated and the case remanded for new trial.

A. The district court's jury instructions erroneously permitted the jury to find infringement based on "subconscious copying" by Williams and Thicke and substantial similarity based on elements of "Got To Give It Up" that are unprotected because not contained in the deposit copy, which defines the scope of the Gayes' copyright. These errors were prejudicial and warrant a new trial.

B. The judgment of infringement should be vacated for the additional reason that the district court abused its discretion in admitting irrelevant expert

testimony about similarities based on non-deposit-copy and otherwise unprotectable elements of "Got To Give It Up."

C.  Because there was even less evidence of extrinsic substantial similarity at trial than on summary judgment, and no evidence of intrinsic similarity, if the denial of summary judgment is not reversed, then a new trial should be granted because the infringement verdict is against the great weight of the evidence.

**III**.  At a minimum, the awards of actual damages, profits, and a running royalty should be reversed or vacated because the record does not support the 50% hypothetical license rate that the district court concluded supports the jury's award of damages and on which the district court relied independently in imposing the running royalty, or the award of more than 41% of the profits earned from "Blurred Lines."

**IV.**  In any event, the entry of JMOL against co-songwriter Harris should be reversed or vacated not only because it is not supported by evidence, but also because it violates the Seventh Amendment in light of the jury's finding of non-infringement against Harris.

## STANDARD OF REVIEW

"A district court's decision to deny a summary judgment motion is reviewed de novo." *Banuelos v. Constr. Laborers' Trust Funds for S. Cal.*, 382 F.3d 897, 902 (9th Cir. 2004).  "A district court's denial of summary judgment is subject to

review on appeal, despite full trial on the merits, where the district court made an error of law that, if not made, would have required the district court to grant the motion." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (quotation omitted).

This Court reviews *de novo* whether a jury instruction misstated the relevant law, *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011), requiring vacatur and remand for new trial "unless the error is more probably than not harmless," *Gantt v. City of L.A.*, 717 F.3d 702, 707 (9th Cir. 2013) (quotation omitted).

To vacate on the basis of an evidentiary ruling, this Court must conclude both that the district court abused its discretion and that the error was prejudicial. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 462 (9th Cir. 2014) (en banc).

Denial of a motion for new trial under Rule 59(a) is reviewed for abuse of discretion. *Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 728 (9th Cir. 2007). "A new trial is warranted when 'the verdict 'is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result.''" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (quoting *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (quoting *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997)).

The "district court's determination of whether to award equitable relief" is reviewed for abuse of discretion, with factual findings reviewed for clear error. *Traxler v. Multnomah Cty.*, 596 F.3d 1007, 1014 n.4 (9th Cir. 2010).

This Court reviews a district court's grant of JMOL *de novo*. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2006). This Court reviews a district court's entry of a declaratory relief *de novo*, and "must exercise its own sound discretion to determine the propriety of the" entry of such relief. *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986) (quotation omitted).

## ARGUMENT

## I. THE DISTRICT COURT SHOULD HAVE GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT

"A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). A plaintiff "may establish copying by showing that defendant had access to plaintiff's work and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

"Substantial similarity" is assessed under "an objective extrinsic test and a subjective intrinsic test," and both tests look only "to *protected* elements of the copyrighted work." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (emphasis in original). On summary judgment, "only the extrinsic test is important because

24

the subjective question whether works are intrinsically similar must be left to the jury." *Id.* "The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Id.* "The extrinsic test . . . serve[s] the purpose of permitting summary judgment in clear cases of non-infringement." *Id.* at 848.

This should have been just such a clear case. The district court should have discounted Finell's and Monson's testimony because based on the sound recording or otherwise generic or unprotectable elements, should have undertaken its own objective comparison of the protected elements of "Got To Give It Up" with "Blurred Lines," and should have entered summary judgment of non-infringement.

Because of these three legal errors, this Court should reverse the denial of summary judgment notwithstanding that the district court proceeded to hold the trial. *See, e.g.*, *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (reviewing denial of summary judgment after trial); *Banuelos*, 382 F.3d at 902 (reviewing whether district court "correctly applied the relevant substantive law" at summary judgment); *id.* at 903-05 (reversing denial of summary judgment after trial where district court "necessarily would have granted" motion "[h]ad [it] only looked at" admissible evidence); *Wilson Arlington Co. v. Prudential Ins. Co.*, 912 F.2d 366, 372-73 (9th Cir. 1990) (similar).

### A. The Gayes' Expert Testimony Provided No Relevant Evidence Of Substantial Similarity

The relevant question at summary judgment was whether any reasonable factfinder could find "Blurred Lines" substantially similar to ***the deposit copy*** of "Got To Give It Up." Neither Finell nor Monson offered any opinion on that question, as both based their opinions on the sound recording—and simply stated that the deposit copy did not change their view. *See supra* at 10, 13. The court should have treated Finell's and Monson's opinion testimony as inadmissible on that basis and disregarded it. *See Newton v. Diamond*, 388 F.3d 1189, 1196 (9th Cir. 2003) (faulting expert's "fail[ure] to distinguish between the sound recording . . . and the composition"); *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988) (discounting testimony of expert who compared unprotectable elements).

The court did not cure this problem by filtering "Got To Give It Up" down to five supposedly "protectable expressions" that appear in the deposit copy. *See* ER133 (finding only five "protectable expressions" in Finell's and Monson's summary judgment testimony: the "11-note signature phrase, four-note hook, four-bar bass line, 16-bar harmonic structure and four-note vocal melody"). That is because Finell and Monson never offered any expert musicological testimony that ***those five elements***, separately or together, are substantially similar to "Blurred Lines." For example, Finell nowhere opined that the two songs were substantially similar if the court considered only the "11-note signature phrase," "four-note

hook," and "four-bar bass line"; and Monson nowhere opined that the two songs were substantially similar if the court considered only the "16-bar harmonic structure" and "four-note vocal melody." To the contrary, each relied on a compilation (or "constellation") that included multiple other features that range far beyond those five elements and that do not appear in the deposit copy, and each expressly conceded that it was the "constellation" and not any individual feature or group of features that created the supposed similarity. *See supra* at 10, 13.

Thus, the Finell and Monson opinions provided no competent and admissible evidence at summary judgment from which to conclude that the Gayes had created triable issues of fact on substantial similarity. *See Newton*, 388 F.3d at 1194 (on summary judgment, the court must "distinguish between whether there is a high enough degree of similarity between the works to establish copying, and whether that copying is substantial enough to constitute infringement"). The district court erred in denying summary judgment based on inadmissible evidence.

**B.    The District Court Erred In Failing To Compare The Two Works**

The district court compounded that error by failing to compare "Blurred Lines" to "Got To Give It Up" after it had winnowed down the latter to the five "protectable expressions" that appeared in the deposit copy. This Court's extrinsic test "requires breaking the works down into their constituent elements, and ***comparing*** those elements for proof of copying as measured by 'substantial

27

similarity,'" to "*protected* elements of the copyrighted work." *Swirsky*, 376 F.3d at 845 (quotation omitted) (first emphasis added). After "filtering out" the unprotected elements that do not appear in the deposit copy, the court erroneously stopped short there, failing to make any ***comparison*** between "Blurred Lines" and what remained of "Got To Give It Up" after that filtration. *See id.*; *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) ("[T]he court must make a detailed comparison of the allegedly infringing and infringed works.").[9] To the contrary, the court merely stated that "the separate analyses of Finell, Wilbur, and Monson of 'Got to Give It Up' and 'Blurred Lines' provide indicia of a 'sufficient disagreement' concerning their substantial similarity to present a genuine issue of material fact." ER133.

Contrary to the district court's ruling, the mere submission of dueling expert reports cannot create a triable question regarding substantial similarity. If that were so, it would sound the death knell of defense-side summary judgment

---

[9]   *See also, e.g.*, *Batiste v. Najm*, 28 F. Supp. 3d 595, 618-24 (E.D. La. 2014) (performing "a side-by-side comparison" to identify similarities, and granting summary judgment as to 42 of 45 claimed infringed musical compositions); *Francescatti v. Germanotta*, No. 11-cv-5270, 2014 WL 2767231, at *12-13, 17-19 (N.D. Ill. Jun. 17, 2014) (granting summary judgment for defendant after conducting detailed comparison of allegedly similar expressions in musical compositions, and finding no substantially similar protected expressions); *Velez v. Sony Discos*, No. 05-cv-0615, 2007 WL 120686, at *13 (S.D.N.Y. Jan. 16, 2007) (finding works to be "starkly different pieces of music" based on detailed comparison of protected expressions).

motions in copyright cases, contrary to this Court's repeated decisions.  *See*, *e.g.*, *Rice v. Fox Broad. Co*., 330 F.3d 1170, 1180 (9th Cir. 2003) (affirming summary judgment for defendants despite submission of competing expert reports); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475-77 (9th Cir. 1992) (affirming summary judgment for defendants despite plaintiff's expert opinion on substantial similarity); *Narell v. Freeman*, 872 F.2d 907, 912-13 (9th Cir. 1989) (affirming summary judgment for defendant despite plaintiff's expert's testimony); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077-81 (9th Cir. 2006) (same) (*see* Brief of Petitioner-Appellants at 25, 43, *Funky Films, Inc. v. Time Warner Entm't Co.*, No. 04-55578 (9th Cir. Jul. 9, 2004)); *see also Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010) (the "existence of dueling expert reports does not necessarily present a triable issue of fact for the jury") (citing cases); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000) ("an issue of fact cannot be created by merely reciting the magic words 'strikingly similar'") (quotation omitted).

By relying on the mere existence of the Finell and Monson opinions, which in any case were inadmissible, *see supra* at 26-27, to find a triable question, the district court abdicated its duty to apply this Court's extrinsic test at summary judgment by making its own objective comparison of the works as properly filtered of any unprotected elements.  That error warrants reversal.

### C.   "Blurred Lines" Is Not Substantially Similar To "Got To Give It Up" As A Matter Of Law

Had the district court properly compared "Blurred Lines" to "Got To Give It Up" after filtering unprotected elements out of the latter, it could have reached only one conclusion:  that the works are not substantially similar under this Court's extrinsic test as a matter of law.   "[S]ummary judgment is appropriate 'if no reasonable juror could find substantial similarity of ideas and expression, viewing the evidence in the light most favorable to the nonmoving party.'" *Smith*, 84 F.3d at 1218 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).   No reasonable juror could find "Blurred Lines" similar to the deposit copy of "Got To Give It Up" as limited to protectable elements.

As an initial matter, the district court erred in requiring only "substantial similarity" and not "virtual identity" between the two works.  This Court applies a sliding scale in assessing substantial similarity; the more unprotected features there are to be filtered out of the comparison, the "thinner" the remaining protected copyright and the greater the degree of similarity required.  *See Ets-Hokin v. Skyy Spirits Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (a "'thin' copyright" protects "against only virtually identical copying").  For example, the Court has required "virtual identity" between accused and copyrighted works where the copyrighted work has few protectable expressions left after the court has filtered out unprotected ideas or standard expressions that no one may monopolize.  *See, e.g.,*

*Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442-43, 1446-47 (9th Cir. 1994) (computer interface); *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914-15 (9th Cir. 2010) (fashion-doll sculpt); *Satava v. Lowry*, 323 F.3d 805, 813 (9th Cir. 2003) (glass jellyfish sculpture); 4 Nimmer at §13.03[A][4].

Here, as in those cases, once Finell's and Monson's testimony was stripped of elements that do not appear in the deposit copy, little remained of the copyrighted work and much of what remained was in any event unprotectable as generic. For example, no musician may monopolize keyboard pitches based on a single, common chord. ER130; *see Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988) (noting the "limited number of notes and chords available to composers and the resulting fact that common themes frequently appear in various compositions, especially in popular music"). Given that only a "thin" copyright was left after the district court filtered unprotectable elements out of Finell's and Monson's "constellations," the district court erred in failing to apply the "virtual identity" test.

Even if the ordinary test for substantial similarity were appropriate, however, the summary judgment record failed to show substantial similarity in the five "protectable expressions" the court found remaining after filtration. *See* ER133 (listing Finell's "11-note signature phrase, four-note hook, [and] four-bar bass line" and Monson's "16-bar harmonic structure and four-note vocal melody").

Four of those five expressions are melodies—as opposed to lyrical phrases, harmony, timbre, instrumentation, tempo, genre, or other musical features. Melody is subject to precise comparison because it is simply a matter of pitch and rhythm. Where the pertinent musicology question is whether two melodies are substantially similar, the only relevant question is whether those two melodies, compared side-by-side in transcription form, have largely the same scale degrees (pitches) set to the same rhythm. Two melodies are not substantially similar unless, as a whole, they contain largely the same notes (pitch/rhythm) used in the same way. Neither Finell's nor Monson's declarations at summary judgment came close to showing such precise similarity.

### 1. No Substantial Similarity In "Signature Phrases"

The so-called "Got To Give It Up" "signature phrase" is a short melodic phrase from the first verse of the song that appears only ***once*** in the 204-measure deposit copy (ER2129, ER2199-2205; *see also* ER707-11)—rendering its designation as the "signature phrase" a misnomer even by Finell's definition (ER2047). To find similarities, Finell parsed the phrase into still smaller pieces and noted some similarities in pitch (scale degree) sequences between those pieces and a phrase plucked from the middle of "Blurred Lines." ER2047-050, ER2129-41. This Court, however, has cautioned that an analysis that concentrates "solely on pitch sequence may break music down beyond recognition," and suggested that

a proper comparison would also consider "key, harmony, rhythm, . . . tempo" and other musical elements, because a musician "would need" that information "to perform a song exactly." *Swirsky*, 376 F.3d at 848 n.13. The purported "signature phrases" here are in different keys, set to different chords, have different rhythms and different lyrics and appear in entirely different places of each song. *See* ER2129-41.

Nor are the numerical scale degree (pitch) sequences themselves even substantially similar—the supposed "Got To Give It Up" "signature phrase" is 5-5-5-5-6-1-2-1-5-6 while the "Blurred Lines" phrase is 3-3-#2-3-5-6-1-1-1-5-4-3. ER2132. Indeed, there is only one note in the two phrases that has the same scale degree and placement in the measure, but not the same duration, as shown below:



ER2129, ER2132, ER123-24. There is thus no shared "succession of similar or the same tones" in the respective phrases, which even Finell admitted is "the most important element in comparing melodies." ER572-73. *See*, *e.g.*, *Cottrill v. Spears*, No. 02-cv-3646, 2003 WL 21223846, at *9-10 (E.D. Pa. May 22, 2003) (granting summary judgment for defendant where alleged similarities in musical

33

works included repetition of a "particular note three times in their verses (although the repeated note is different in each song)").

Further, to highlight alleged similarities in the "signature phrases," Finell improperly "alter[ed] the actual sequence or construction of" the notes in "Got To Give It Up" "in order to achieve a juxtaposition that makes for greater similarity with" "Blurred Lines." *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 654 F.2d 204, 211 (2d Cir. 1981) (quotation omitted). For example, she compared the use of scale degrees 5-6-1 followed by 1-5, even though the notes sung *between, before, and after* those phrases differ in each song, and in "Got To Give It Up," scale degree 2 is sung between "5-6-1" and "1-5" and is *emphasized*, while scale degree 2 is not in "Blurred Lines" at all. ER2014, ER2132.[10] Moreover, these short strings of notes are unprotectable as a matter of law, *see* U.S. Copyright Office, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 313.4(B) (3d ed. 2014) ("musical phrase consisting of three notes" not copyrightable), and any "copying" of them is *de minimis* and not actionable, *see*, *e.g.*, *Newton*, 388 F.3d at 1196-97

---

[10] Finell made similar alterations to the "melismas" in the "signature phrases. A "melisma" is "a vocal melody in which one syllable or lyric is held while sung with several successive pitches." ER2015. The "Got To Give It Up" melisma uses scale degrees 1-5-6 and three eighth notes, starting on the offbeat; by contrast, "Blurred Lines" uses scale degrees 1-5-4-3, with quarter, two sixteenth, and eighth notes, starting on the beat. ER2139-40. But Finell reduced the melismas in the "signature phrase" to two notes to try to highlight the similar use of a "1-5" scale degree at the beginning of each melisma. ER2014-16, ER2048.

(defendant's verbatim copying of "three notes separated by a half-step over a background C note" was *de minimis*).[11]

### 2. No Substantial Similarity In "Four-Note Hooks"

There is likewise no substantial similarity between the four-note so-called "hooks" (ER2141-43), which differ in all relevant considerations: pitches (6-1-2-1 in "Got To Give It Up" and 6-1-1-1 in "Blurred Lines"), rhythm, chords (A7 in "Got To Give It Up", E and A in "Blurred Lines"), harmonies, lyrics, and the "point in the song" in which "they are found" (3:12 in "Got To Give It Up," :49 in "Blurred Lines") (ER2142-43, ER2050), *see Swirsky*, 376 F.3d at 848:



ER125; ER2133, ER2141-43, ER2051-52.

---

[11] *See also*, *e.g.*, *Jean v. Bug Music, Inc.*, No. 00-cv-4022, 2002 WL 287786, at *6 (S.D.N.Y. Feb. 27, 2002) (three-note "sequence C, B-flat, C commonly appears in music" and "is not susceptible to copyright protection"); *McDonald v. Multimedia Entm't, Inc.*, No. 90-cv-6356, 1991 WL 311921, at *3-4 (S.D.N.Y. Jul. 19, 1991) (identical three-note "1-lower 6-5" scale degree sequence did not support inference of copying; defense expert was Judith Finell); *Allen v. Destiny's Child*, No. 06-c-6606, 2009 WL 2178676, at * 12 (N.D. Ill. Jul. 21, 2009) ("single, common three-note sequence" in similar location is not protectable).

### 3. No Substantial Similarity In "Four-Bar Bass Lines"

The four-bar bass melodies likewise have different numbers and placements of notes, and have only three notes that share the same pitch, rhythm, and placement, as shown in the following transcriptions:



ER128, ER2150-53.

Apart from these three notes, the respective bass lines share only the *idea* of playing the first scale degree (the root of the chord) on or before the first beat of the measure on three occasions, a common idea for the bass in popular music. ER118-19, ER2151-53. But such a commonplace bass expression in popular music is generic and unprotectable. *See Apple Computer*, 35 F.3d at 1443 ("[S]imilarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market."). The other claimed similarities are trivial—the scale degrees 4 and b7 appear in each four-bar phrase, but at different locations and frequency in the phrase, among other

36

differences. ER2152-53. Thus, again, the critical shared "succession of similar or the same tones" is lacking. ER572-73.

### 4. No Substantial Similarity In "Four-Note Vocal Melody"

There are likewise no similarities between the four-note vocal melody (which has only 3 tones) appearing once in "Got To Give It Up" at the 2:10 mark of the sound recording and sung to the lyrics "*move it up*," and the three-note sequences of "Blurred Lines" sung to the lyrics "*hey, hey, hey*." The lyrics, pitches (g-g-a in "Got To Give It Up," d-d#-e in "Blurred Lines"), and rhythms are different. *Compare* ER2084 (Example 11 ("move it up")) *with* ER2086-87 (Example 12 ("hey, hey, hey")). No one can infringe a short sequence of notes where the pitches and rhythm are not the same, which explains why the Gayes did not claim this as a similarity at trial.

### 5. No Substantial Similarity In "Harmonic Structure"

Finally, contrary to Monson's testimony (ER2079-891, ER2121-22), there are no similarities in the "harmonic structure" of the songs because the chords and chord patterns—which comprise the "harmony"—are wholly ***dissimilar***, as the first sixteen bars (alleged "16 bar harmonic structure") of each song illustrate:

| Measure | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| Give It Up | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | A 7 | D7 | E7 | A7 | B7 | D7 | E7 | A7 | B7 |
| Blurred | A | A | A | A | E | E | E | E | A | A | A | A | E | E | E | E |

ER131, ER2121-22. "Blurred Lines" has only two chords: A and E. ER670-71. The use of the A7, D7, and E7 chords in a specific arrangement in "Got To Give It Up" cannot bar the use of different chords in a different arrangement in "Blurred Lines."

*In sum*, had the district court properly applied the extrinsic test and considered admissible evidence and protectable elements only, it necessarily would have concluded that no reasonable juror could find that "Got To Give It Up" and "Blurred Lines" are substantially similar. This Court should therefore enter summary judgment in favor of the "Blurred Lines" parties.

## II. ALTERNATIVELY, THE JUDGMENT SHOULD BE VACATED AND THE CASE REMANDED FOR NEW TRIAL

Even if the Court declines to reverse and direct entry of judgment for the "Blurred Lines" parties, it should nonetheless vacate and remand for new trial. Two of the jury instructions were erroneous, and the district court abused its discretion in several rulings concerning the admission of evidence—in all instances prejudicing the "Blurred Lines" parties.

### A. Two Crucial Jury Instructions On Copyright Infringement Were Erroneous

#### 1. Instruction 42 Improperly Invited Consideration Of "Subconscious Copying"

Instruction 42 informed the jury that, "to find that the Thicke Parties copied" "Got To Give It Up," it need not find that they "consciously or deliberately copied"

the song, but only that they "subconsciously copied" the song. ER1548. That instruction should not have been given. Because copying is rarely proved directly, it is often proved circumstantially by evidence of access to the copyrighted work plus substantial similarity. *See, e.g., Three Boys Music*, 212 F.3d at 481-82. Where access is disputed, copyright-holders may be allowed to prove access through "a theory of widespread dissemination and subconscious copying"— namely, that a song was so popular that the accused infringer likely heard it long ago but forgot as much. *Id.* at 482-83 (citing *Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 147-48 (S.D.N.Y. 1924) (L. Hand, J.)); *see id.* at 483-84 (allowing evidence that an Isley Brothers song had been disseminated where the defendant singer Michael Bolton disputed having heard it).

But "access" to "Got To Give It Up" was *not* in dispute here, where Williams and Thicke, far from denying they had heard "Got To Give It Up," acknowledged that they had heard and admired the song. ER361, ER1420, ER1428. Thus any subconscious copying instruction here was inappropriate. Because access was undisputed, the *only* issue pertinent to the element of copying here was whether the works are substantially similar, and the instruction should have been so limited.

Although legally irrelevant, the court's invitation to the jury to consider "subconscious copying" greatly prejudiced Williams and Thicke. At trial, the

district court permitted the Gayes to present evidence that Williams and Thicke admired Marvin Gaye and were inspired by "Got To Give It Up"—over the "Blurred Lines" parties' objection. ER107. That ruling enabled the Gayes to focus repeatedly at trial on Williams' and Thicke's supposed subjective intent to copy "Got To Give It Up." ER229-52, ER383, ER1445-48, ER1558-66, ER1606-10. Instruction 42 erroneously gave the jury a legal hook to treat that evidence as proof of infringement based on the irrelevant concept of "subconscious copying." That it worked to prejudice Williams and Thicke is evident from the fact that the jury split the verdict, finding liability against Williams and Thicke but not against Harris, as to whom the Gayes introduced no subjective-intent evidence.

### 2. Instruction 43 On "Substantial Similarity" Erroneously Failed To Filter Out Unprotected Elements

Instruction 43 erred in explaining the Gayes' burden of proving "there is substantial similarity between" the parties' works. ER88-89, ER1707. The district court told the jury that "***you must consider*** the elements of each of the works and decide if they are substantially similar" and that "[t]here has been testimony and evidence presented by both sides on this issue, including by expert witnesses, as to such matters as . . . the so-called 'Signature Phrase,' hook, 'Theme X,' bass melodies, keyboard parts, word painting, lyrics, rap v. parlando; . . . ." ER88-89 (emphasis added), ER1707. The court nowhere instructed the jury to limit its assessment of substantial similarity to ***protected*** element*s* of "Got To Give It Up."

40

To the contrary, the court actively directed the jury's attention to ***unprotected*** elements like "Theme X," bass melodies, and keyboard parts.

Instruction 43 was plainly erroneous under *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989). *Harper House* vacated and remanded a judgment of infringement of a copyrighted book-style "organizer" on the ground that the jury instructions on substantial similarity had failed to adequately distinguish between protectable and unprotectable material. *Id*. at 206-08. [12] Likewise here, the district court failed to instruct the jury to consider only protectable expression. To the contrary, the court told the jury that it "***must*** consider the elements of each of the works and decide if they are substantially similar," including even unprotectable elements like "Theme X," bass melodies, and keyboard parts that it should have told the jury ***not*** to consider. And, again as this Court held erroneous in *Harper House*, *see id.* at 206-08, the district court

---

[12]   The erroneous instruction in *Harper House* stated:

You should ask yourself whether the ordinary reasonable person would find the total impact and effect of Defendants' work substantially similar to Plaintiff's work . . . .

In comparing Plaintiff's and Defendants' organizers to determine whether there has been copyright infringement, you must consider and compare the contents of each of the works as a whole. That is, you must not simply focus on isolated elements of each work to the exclusion of the other elements, combination of elements and expressions therein.

889 F.2d at 206.

wrongly invited the jury to compare "Got To Give It Up" and "Blurred Lines" *as a whole*, without directing it to focus on any similarities in individual protectable elements.  ER89, ER1707 (instructing jury to consider whether "there is enough similarity between a work of the Gaye Parties and an allegedly infringing work of the 'Blurred Lines' parties to comprise a substantial amount").  The district court similarly failed to limit its "intrinsic similarity" instruction to protectable expression.  ER89, ER1707 (instructing the jury to decide "if an ordinary, reasonable listener would conclude that the total concept and feel of the Gaye Parties' work and the 'Blurred Lines' parties' work are substantially similar").

In denying a new trial based on instructional errors, the district court did not hold that Instruction 43 was correct but only that other surrounding instructions worked to cure it.  *See* ER24 (citing, *e.g.*, Instruction 30, stating that similarity may not be based on "ideas, as distinguished from the expression of those ideas").  That effort, however, is no more availing here than in *Harper House*.  There, the Court held instructions requiring Harper House "to make a showing of 'substantial similarity' between 'protectable expressions' in the organizers" to be "of little value because these instructions did not adequately explain to the jury which material was, in fact, protectable."  889 F.2d at 207.  The same is true here, where *no instruction* identified the unprotected material in "Got To Give It Up," or instructed the jury that it had to identify such material and how to do so.

Such an erroneous instruction is presumed prejudicial, *see, e.g.*, *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005), but the prejudice here in any event cannot be overstated. The Gayes' expert testimony focused pervasively, over the "Blurred Lines" parties' objections, on unprotected elements of "Got To Give It Up." *See*, *e.g.*, ER559-60, ER604-27, ER633-41, ER641-48, ER2419-31 (Finell testifying that the unprotected descending bass line and keyboard parts formed the "heartbeat" of "Got To Give It Up"). Given the substantial testimony the jury heard regarding unprotected elements, the language in Instruction 43, instructing the jury that it ***must*** consider those elements and could simply consider the works ***as a whole***, created an obvious "risk of an improper verdict for [the Gayes], and a need for further instructions to protect legitimate activity and avoid the suffocation of competition." *Harper House*, 889 F.2d at 207. At the very least, the Gayes cannot meet their burden on this record "to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Dang*, 422 F.3d at 811 (quotation omitted).[13]

---

[13] The importance of instructions that correctly filter out unprotected elements in popular music cases is illustrated by the jury's non-infringement verdict in the recent case involving Led Zeppelin's song "Stairway to Heaven." There, unlike here, the district court identified specific musical elements that were not protected by the plaintiff's copyright (*e.g.*, "descending chromatic scales, arpeggios or short sequences of three notes"), and directed the jury to "disregard" such elements in assessing similarity. *Skidmore v. Led Zeppelin*, C.D. Cal. Case No. CV 15-03462-RGK(AGRx), Dkt. 273 at Instructions 16 & 21 (June 23, 2016).

A new trial should be ordered based on the instructional errors in Instructions 42 and 43.

## B. The District Court Abused Its Discretion In Admitting Irrelevant And Prejudicial Evidence

A new trial should be granted for the additional reason that evidentiary errors by the district court "more probably than not . . . tainted the verdict." *Harper v. City of L.A.*, 533 F.3d 1010, 1030 (9th Cir. 2008) (quotation omitted).

### 1. Finell's Testimony Was Improperly Based On Unprotected Elements

Despite her concessions that the deposit copy does not contain "Theme X," any keyboard parts, or the descending bass line (ER776, ER797-98, ER807-08, ER1840, ER1986), Finell nonetheless testified to these unprotected elements at trial, asserting that they are "implied" in the deposit Copy and thus included in the Gayes' copyright (ER772-74, ER782-83, ER798). The district court denied the "Blurred Lines" parties' request to hold a *Daubert* hearing on Finell's new opinions (ER175-76, ER496-97), and permitted her, over the "Blurred Lines' parties objections, to play edited sound recordings of "Theme X," the keyboard parts, and the descending bass line and compare them to allegedly similar melodies in "Blurred Lines" (ER611, ER614, ER619, ER622-23, ER2419, ER2421-23, ER2427-29). She was even permitted to refer to such unprotected elements as the

"heartbeat" and "pulse" of "Got To Give It Up." ER629, ER642, ER644, ER661, ER2419.

In admitting this testimony, the district court abused its discretion under Federal Rules of Evidence 401, 403, and 702. Testimony about elements that do not appear in the deposit copy is irrelevant and cannot be helpful to the jury as a matter of law. And the court should have excluded any testimony as to what is "implied" in the deposit copy as contrary to copyright law, which treats the deposit copy as defining the scope of the copyright. Allowing testimony like Finell's would encourage musical artists to register skeletal sheet music and then wait to "fill in the gaps" with experts after they assert infringement claims against unknowing defendants. And Finell concededly lacked any expert qualifications to opine on the legal question of the scope of the Gayes' copyright, as Finell herself admitted at trial. ER101, ER703 (Finell testifying that she had "never" before been "asked the legal question in terms of what is copyrighted").

Williams and Thicke were substantially prejudiced by Finell's improper testimony based on "Theme X," the keyboard parts, and the bass melodies that are not notated in the deposit copy. Finell's testimony was the focus of the Gayes' case-in-chief, spanning two of the seven days of trial, and was emphasized in the Gayes' closing arguments. The jury was then instructed that it "**_must_**" consider **_all_** elements of "Got To Give It Up" about which it heard testimony, including

"Theme X," "bass melodies," and "keyboard parts." ER1548 (emphasis added). It is thus manifestly "more probabl[e] than not" that these evidentiary errors "tainted the verdict," *Harper*, 533 F.3d at 1030 (quotation omitted).

### 2. Monson's Testimony Was Improperly Based On Unprotected Elements

Over the "Blurred Lines" parties' objections, the district court also permitted Monson to testify about "mashed-up" sound recordings she created that combined excerpts of "Blurred Lines" and the "Got To Give It Up" sound recording, including keyboard parts, bass melodies, and even Marvin Gaye's vocals that nowhere appear in the deposit copy. ER864-68. This testimony was irrelevant because premised on elements of "Got To Give It Up" that are not covered by the Gayes' copyright, and because the mash-ups' mere showing that two songs are "compatible" cannot show substantial similarity; as Monson admitted, "any number of melodies . . . could fit over the relatively simple chord pattern of" "Blurred Lines." ER900-02. This evidence was thus improperly admitted and prejudicial for the same reasons as Finell's. These evidentiary errors warrant vacatur and remand.

### C.    A New Trial Is Warranted Because The Verdict Was Against The Great Weight Of The Evidence

If reversal or vacatur is not otherwise ordered, this Court should vacate nonetheless because the infringement verdict is against the clear weight of the evidence. *See Oracle*, 765 F.3d at 1093.

### 1.    The Verdict Is Not Supported By Any Evidence Of Substantial Extrinsic Similarity

At trial, the Gayes presented no evidence of two of the five "protectable expressions" the district court considered on summary judgment—Monson's "four-note vocal melody" and "harmonic structure."  Any similarities in those elements (and there are none) thus could not support the infringement verdict.

Thus, the only alleged similarities in "protectable expressions" that were presented at trial relate to the same (i) "signature phrases," (ii) "hooks," and (iii) four-bar bass melodies that were considered on summary judgment.  As shown above, *supra* at 33-37, those elements are not substantially similar to "Blurred Lines" as a matter of law, and the Gayes presented no additional evidence on those elements at trial to overcome that conclusion.  In fact, Finell used a demonstrative exhibit at trial that relied upon the same preliminary report she had prepared before trial when she had never seen the deposit copy.  ER698-99, ER2418.

Nor did the Gayes present any other admissible evidence of similarities that could support an infringement verdict.  At trial, Finell added two new purported

similarities relating to (i) so-called "word painting," and (ii) the placement of "rap" and "parlando" sections in the songs. Neither element amounts to protectable expression and neither is substantially similar to "Blurred Lines."

***Word Painting.*** There is no dispute that "Got To Give It Up" and "Blurred Lines" have no two consecutive words in common. ER346, ER1031-32. But Finell advanced at trial a theory of "word painting"—a made-for-litigation theory with no accepted musicological meaning or indicia of reliability. She testified that music can be used to "paint the words in the lyrics"—such as when the notes in a song "go higher" when the "song is singing about going higher." ER649. She testified that the lyrical phrase "*Move it up, turn it 'round, ooh shake it down*" in "Got To Give It Up" is "paint[ed]" in a similar way as the lyrical phrase "*Shake around, get down, get up*" in "Blurred Lines." ER808-13, ER648-53, ER2430.

Such testimony was so unreliable that it should never have been admitted, but even if "Got To Give It Up" and "Blurred Lines" both "paint words," that is a mere unprotectable ***idea***, and as the above example makes clear, it is ***expressed differently*** in each song. Indeed, the respective phrases Finell identified have different words in different orders, a "very, very different rhythm," "different notes," and appear in different places in each song. ER1075-78. Moreover, given the common usage of words like "shake," "up," and "down" in popular music, any

similarities relating to the usage of such words should be assessed under an exacting standard of similarity, which plainly is not met here.

*Rap/Parlando.* Finell's other new "similarity" at trial relates to the placement within the structure of each song of a supposed "parlando"—or "chanted"—vocal section. But the deposit copy of "Got To Give It Up" indicates no particular singing style for the "parlando"; Finell's "parlando" testimony was based only on the sound recording, and thus provides no support for the jury's verdict. ER1079-82.[14]

Nor are there any similarities in the ***expressions*** of the "rap" in "Blurred Lines" and the so-called "parlando" in "Got To Give It Up": there was no dispute that the melodies, rhythms, chords, and lyrics that are rapped or sung (or "chanted") in the two sections are entirely different. While Finell suggested (ER658-59) that the rap and parlando both start at the same measure in their respective songs, they do ***not*** (ER1080, ER2413), and even if they did such a similarity would be *de minimis*, *see Newton*, 388 F.3d at 1193 (use is *de minimis* "if the average audience would not recognize the appropriation").

---

[14] Spoken words are notated in sheet music by the placement of an "x" over the notes. ER1039-41. Such notation is used in the "rap" section of the "Blurred Lines" sheet music and in one section of the "Got To Give It Up" deposit copy, but not anywhere within the so-called "parlando" section. ER1034-39, ER2413.

Finally, while Finell testified about similarities in "Theme X," keyboard pitches and rhythms, and the descending bass line, that testimony does not support the jury's verdict because none of those elements is notated in the deposit copy. Finell admitted as much on cross-examination. ER776 ("Theme X"); ER797-98 (keyboard pitches and rhythms); ER807-08 (descending bass line). Accordingly, Finell's testimony fails to support the infringement verdict.

## 2. The Verdict Is Not Supported By Any Evidence Of Substantial Intrinsic Similarity

Absent any evidence to support the jury's finding of substantial extrinsic similarity between "Got To Give It Up" and "Blurred Lines," there is no need to assess the sufficiency of the evidence of substantial intrinsic similarity. *See Swirsky*, 376 F.3d at 845 (requiring both extrinsic and intrinsic similarities). In any event, the evidence at trial does not support a finding of substantial intrinsic similarity.

This Court's "intrinsic test" requires a jury to find "the total concept and feel of the [two works] to be substantially similar," *Three Boys*, 212 F.3d at 485, based only on protected extrinsic expressions of the works, *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc*., 109 F.3d 1394, 1398 (9th Cir. 1997) ("the 'intrinsic' test . . . asks if an 'ordinary reasonable person' would perceive a substantial taking of protected expression"). The jury heard only one musical depiction of the deposit copy. ER2307. No reasonable jury that compared that audio exhibit with the

sound recording of "Blurred Lines" (ER2445), could conclude that the "total concept and feel" of those works is substantially similar. This Court may listen to both recordings to confirm as much. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 879 (9th Cir. 2016).

## III. THE AWARDS OF ACTUAL DAMAGES, PROFITS, AND A RUNNING ROYALTY SHOULD BE REVERSED OR VACATED

An award of damages may not rest on "speculation or guesswork" or "*improperly considered* evidence," *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (quotation omitted), but rather must be supported by "competent evidence," *Central Office Tel., Inc. v. Am. Tel. & Tel. Co.*, 108 F.3d 981, 991 (9th Cir. 1997), *rev'd on other grounds*, 524 U.S. 214 (1998). Here, there is no competent evidence to support the jury's awards of actual damages and profits, even as remitted, and the district court likewise abused its discretion by imposing a running royalty in reliance on the same insufficient evidence.

### A. The Award Of Actual Damages Is Not Supported By Any Competent Evidence

The judgment of $3,188,527.50 in actual damages, even as remitted from $4 million, is excessive and not supported by any admissible evidence.[15]

---

[15] The district court reasoned that the jury had intended to award 50% of publishing revenues but that it had erred in telling the jury that that figure was $8 million. It accordingly remitted the judgment from $4 million to $3,188,527.50, or 50% of the actual publishing revenues of $6,377,055. ER32. ER34.

### 1. Stern's Testimony Regarding Actual Damages Should Have Been Excluded

The district court abused its discretion by admitting Stern's testimony regarding a "hypothetical license," which was the sole evidence of actual damages that the Gayes offered. The "touchstone for hypothetical-license damages is 'the range of [the license's] reasonable market value." *Oracle*, 765 F.3d at 1088. An expert therefore must link a proposed license rate "to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *see Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("hypothetical-negotiation determination must be tied to the particular work at issue and its marketplace value"). The failure to do so renders the expert testimony "arbitrary, unreliable, and irrelevant," such that it "fails to pass muster under *Daubert* and taints the jury's damages calculation." *Uniloc*, 632 F.3d at 1318 (ordering new trial where testimony regarding hypothetical negotiation was premised on "25% rule of thumb" that failed to consider "other licenses involving the patent at issue or comparable licenses").

Here, Stern did not conduct any analysis at all regarding a hypothetical licensing negotiation or the market value of "Got To Give It Up." Instead, she reached her conclusion that the "value of the use of" "Got To Give It Up" in

"Blurred Lines" is 50% simply by "reviewing the snippets [of "Got To Give It Up"
prepared by Finell] and . . . A-B'ing them, going back and forth . . . against 'Got to
Give It Up' and 'Blurred Lines.'" ER963-64. Apart from briefly "review[ing] the
music," she made no attempt to identify the "reasonable market value" for the
portions of "Got To Give It Up" that allegedly were used in "Blurred Lines," and
she offered no evidence about any previous license for "Got To Give It Up" or the
value of "Got To Give It Up" itself, or of any prior license of any other Marvin
Gaye song, or any R&B song, or any license at all. ER965; *see generally* ER953-
75.

Stern's opinion is also unreliable and inadmissible because it was based on
alleged similarities between "Blurred Lines" and the sound recording of "Got To
Give It Up," including Finell's edited sound recordings that contain elements such
as keyboard parts and "Theme X" that are unprotected because not in the deposit
copy. ER961-64. Her reliance upon Finell's flawed similarity opinions, *see supra*,
at 26-28, 45-46 is a further reason why her testimony should have been excluded as
irrelevant and prejudicial, leaving no evidence to support any award of actual
damages.

In addition, Stern's analysis is devoid of "sufficient objective evidence of
the market value of the hypothetical license underpinning the jury's damages
award." *Oracle*, 765 F.3d at 1093. This omission renders the opinion inadmissible

and unreliable. *Cf. Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) (damages properly based on "at least six estimates of the fair market value" of infringed work); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708-09 (9th Cir. 2004) (damages supported by evidence of prior quote for use of copyrighted material).

### 2. Stern's Testimony Fails To Support The Actual Damages Award

Even if Stern's testimony were properly admitted, it does not support the damages award of $3,188,527.50. Stern testified that the "industry standard" for negotiating the percentage of a new composition that the owner of an older composition should receive for its use in the new song is to allocate "50 percent for the music, 50 percent for the lyrics," and then negotiate from there based on the specific "usage" at issue. ER958. Stern acknowledged, however, that the lyrics of "Blurred Lines" do not infringe (ER968-69)—meaning that 50% of the publishing revenues is off the table. Thus, by applying a 50% licensing rate, the jury effectively allocated 100% of the music in "Blurred Lines" (comprising the remaining 50% of the publishing revenues) to "Got To Give It Up"—a conclusion at odds with the musicology evidence discussed above, which establishes that, at most, a small fraction of the musical content of "Blurred Lines" is derived from protected musical elements in "Got To Give It Up."

Accordingly, the award of 50% of the total publishing revenues of "Blurred Lines," representing a wholesale appropriation of **all the music** in "Got To Give It Up," is unsupported by Stern's own "standard" for determining license rates, and should be reversed or vacated for this reason too.

## B. The Awards Of Profits Are Not Supported By Any Competent Evidence

The awards of $1,768,191.88 in profits against Thicke and $357,630.96 against Williams, which amounted to 41.6% of the total non-publishing profits that each of them earned (*see* ER169-70), also are grossly excessive and unsupported by any competent evidence.

As a matter of law, any award of profits had to be limited to "profits of the defendant attributable to the infringement." ER80, ER85, ER1702 (Instruction No. 38); ER1709-10. Here, there was trial evidence of, at most, three protected expressions of "Got To Give It Up" that were used in "Blurred Lines," *see supra* at 47, amounting to a small fraction of the musical content of "Blurred Lines." The vast majority of the musical content of "Blurred Lines"—including all the lyrics and most of the musical elements that Finell opined "operate in combination with one another" and "permeate" throughout "Blurred Lines" (ER2004)—is **not infringing** because it does not copy protected expressions of "Got To Give It Up." Moreover, evidence that was undisputed at trial establishes that the financial success of "Blurred Lines" is attributable primarily to factors that have nothing to

55

do with any possible use of "Got To Give It Up," including the popularity of a music video of the song, the "star power" of the performers, live performances, promotional appearances, product tie-ins, and the massive financial investment in marketing and promotion. ER1289-1306, ER1337-61.

When all these lawful elements and factors are considered, the profits awards that attribute 41.6% of the success of "Blurred Lines" to copying of protected elements of "Got To Give It Up" is clearly erroneous. *See, e.g.*, *Abend v. MCA, Inc.*, 863 F.2d 1465, 1480 (9th Cir. 1988) (remanding for apportionment determination where popularity of celebrities in film "clearly contributed" to the success), *aff'd on other grounds*, 495 U.S. 207 (1990). At most, the evidence supports a profits award of 5% of the non-publishing revenues from "Blurred Lines," as this is the maximum percentage of the musical content of "Blurred Lines" that allegedly derives from protected expressions of "Got To Give It Up." ER1122-23.

### C. The Award Of A Running Royalty Is Not Supported By Any Competent Evidence

The district court abused its discretion by awarding the Gayes a running royalty at the rate of 50% of future "songwriter and publishing revenue" as an alternative to a permanent injunction. The district court premised this royalty on the same hypothetical license negotiation that it held supported the jury's actual damages award. ER54 ("Ongoing copyright royalties 'should be calculated based

on a hypothetical, arms-length negotiation between the parties,' in light of 'what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work.'") (quoting *Gaylord*, 678 F.3d at 1343). As shown, the 50% rate is grossly excessive and not supported by any competent evidence. For the same reasons that the 50% rate does not support the actual damages award, it likewise does not support a running royalty at that rate. At a minimum, any running royalty should be reduced to no more than 5% of future publishing revenues. ER1122-23.

## IV. THE JUDGMENT AGAINST HARRIS SHOULD BE REVERSED AS CONTRARY TO THE JURY VERDICT

Finally, for all the reasons set forth in the Brief of Appellants-Cross-Appellees Interscope *et al.*, which Williams, Thicke, and Harris hereby incorporate by reference, the district court's entry of judgment in favor of Harris violates Harris's Seventh Amendment right to a trial by jury and is procedurally unsound, including because the Gayes never filed a motion for JMOL against Harris under Rule 50, and further because the Gayes waived their right to seek relief for the inconsistent verdict. *See* Br. of Interscope *et al.* at 19-36.

Moreover, as to Harris in particular, the district court's justification for entering JMOL fails for the additional reason that Harris is not, and was never alleged to be, a ***distributor*** of "Blurred Lines." Thus, the district court lacked any basis for its conclusion (ER47) that it erred in failing to instruct the jury "that the distribution of infringing works constitutes copyright infringement" and that had

the jury been so instructed, it would have found Harris liable too.  Similarly, the fact that the jury found both a composer of "Blurred Lines"—Harris—and the song's distributors not liable for infringement shows that it did not, as the district court concluded (ER47-48), erroneously distinguish between composer liability and distributor liability.  Instead, the jury must have concluded that "Blurred Lines" is not substantially similar to "Got To Give It Up"—because had it done so, it necessarily would have found all three similarly situated composers liable, notwithstanding any instructional errors that allowed it to overlook distributor liability.  Thus the judgment against Harris should be reversed for this reason in addition to the reasons above.

## CONCLUSION

The judgment should be reversed.  Alternatively, the judgment should be vacated and the case remanded for new trial.


Dated:  New York, New York          Respectfully submitted,
            August 23, 2016

                                             s/ Kathleen M. Sullivan
                                             Kathleen M. Sullivan
                                             QUINN EMANUEL URQUHART
                                             & SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, New York 10010

## <u>REQUEST FOR ORAL ARGUMENT</u>

Plaintiffs-Appellants-Cross-Appellees Pharrell Williams, Robin Thicke, Clifford Harris, Jr., and More Water From Nazareth Publishing, Inc. respectfully request that this Court hear oral argument in this case.

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Plaintiffs-Appellants-Cross-Appellees Pharrell Williams, Robin Thicke, Clifford Harris, Jr., and More Water From Nazareth Publishing, Inc. certify that they are aware of no known related case pending in this Court.

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(C)</u>
## <u>AND CIRCUIT RULE 32-1</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, the attached

opening brief is proportionately spaced, has a typeface of 14 points or more and

contains 13,282 words.

DATED:  August 23, 2016          QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP



                            By  s/ Kathleen M. Sullivan
                                Kathleen M. Sullivan

                                *Attorney for Plaintiffs-Appellants-Cross-*
                                *Appellees Pharrell Williams, Robin*
                                *Thicke, Clifford Harris, Jr., and More*
                                *Water From Nazareth Publishing, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Kathleen M. Sullivan, a member of the Bar of this Court, hereby certify that on August 23, 2016, I electronically filed the foregoing "Opening Brief Of Plaintiffs-Appellants-Cross-Appellees Pharrell Williams, Robin Thicke, Clifford Harris, Jr., And More Water From Nazareth Publishing, Inc." and accompanying "Excerpts of Record" with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>s/Kathleen M. Sullivan</u>